STATE EX REL. BLACK ET AL. *v.* BURCH, AUDITOR OF STATE OF INDIANA.

[Nos. 28,433, 28,434, 28,435, 28,436.   Filed June 30, 1948. Rehearing denied November 8, 1948.]

448

*Frederick E. Schortemeier, Robert K. Eby,* and *Joseph G. Wood,* all of Indianapolis, attorneys for appellant.

*Albert Ward, Palmer K. Ward, Arthur L. Gilliom, Robert D. Armstrong,* and *Elbert R. Gilliom,* all of Indianapolis, attorneys for appellee, and *Cleon H. Foust,* Attorney General, *Frank E. Coughlin,* First Deputy Attorney General and *Robert Hollowell, Jr.,* Chief Counsel.

STARR, J.—These four appeals were consolidated for briefing by leave of this Court and but one brief has been filed on behalf of the appellants. Although each appellant has filed his transcript and perfected his appeal, due to the similarity of these cases, we have attempted to incorporate in this opinion our decision in each of these appeals.

Each of these actions is an action in mandate against Alvan V. Burch as Auditor of the State of Indiana. The relator in Cause No. 28,433 is Clyde R. Black; in Cause No. 28,434, Elmer C. Weller; in Cause No. 28,435, Charles T. Miser; and in Cause No. 28,436, Beecher Conrad. From an adverse judgment in each case each appellant has appealed.

The records disclose by stipulation, that the said Clyde R. Black at the general election held in November, 1944, was elected to the Senate of the General Assembly of Indiana for a term of four years com-

mencing on the 8th day of November, 1944; that on January 4, 1945, he qualified as such member by taking the oath of office and served as such during the 84th Session of the General Assembly held in 1945, also during the 85th Session of the General Assembly held in 1947; that he received his salary as such senator for the year 1947 in the sum of $1,200 which was paid in two installments of $600 each; the first of which was on January 15, 1947, and the balance on February 15, 1947, and that he has received a warrant for $300 for the salary as such member of the General Assembly for the first quarter of 1948; that the payment of salary was made at the time and in the amount as provided by § 34-201b, Burns' 1933, 1947 (Supp.) ; that on April 27, 1945, he was duly appointed as Secretary of the Indiana Flood Control and Water Resources Commission under and by authority of § 27-1106 Burns' 1933, (1945 Supp.) ; that he immediately entered upon the performance of his duty as such secretary and has continued to perform said duties since that date except during the 85th Session of the General Assembly; that on January 8, 1947, and before the opening day of said 85th Session in which he served, he resigned as such secretary; that after the close of the 85th Session, to-wit: on March 7, 1947, he was reappointed and re-entered upon the performance of his duties as such secretary and has since that date continued to perform these duties.

It also appears by stipulation that the relator, Elmer C. Weller, was elected a member of the House of Representatives of the General Assembly at said election held in November, 1944; that he qualified and served in the regular session of said 84th General Assembly; that on April 1, 1945, after the close of said session, he was appointed by the Public Service Commission of

Indiana as Director of its Motor Vehicle Department at a stipulated monthly salary; that his duties as such director consist principally of such matters as the assignment of hearing days for hearing applications and petitions for motor vehicle carriers under the Motor Vehicle Act of the State of Indiana, and to hear the same or to assign hearing examiners for hearing such petitions and draft orders following such hearings in the name of said Commission subject to the approval thereof by said Commission. The department of which he is director is the supervising department of said Commission and is staffed by clerks, stenographers, investigators, examiners and other employees to perform and work in this department under his general supervision and direction as such director. Also included in the work of said department is the receiving and filing of applications, petitions, and other papers by motor vehicle carriers; the registration of motor vehicles; the docketing of hearings; the writing of recommended orders for submission to the Public Service Commission of Indiana for approval; and other work and services incident to the administration of the Motor Vehicle Act, such as the preparation and delivery of certificates of public convenience and necessity to such carriers, and the filing of reports and bonds of carriers.

Said Weller was again elected a member of said House of Representatives at the general election held in November, 1946, and qualified and served as such member during the 85th Session of said General Assembly; that before the opening day of said Session, to-wit: on the 8th day of January, 1947, he resigned his position as such director of said Motor Vehicle Department; that he received his salary of $1,200 for the year 1947 as a member of the General Assembly at the

same time as the said Clyde R. Black received his salary; that on the 11th day of April, 1947, after the close of said 85th Session of the General Assembly he was reappointed as such director of the Motor Vehicle Department effective at said date at a monthly salary and did, at said time, resume his duties as such director, and has ever since continued to perform and carry out this position.

It is also stipulated that the relator, Charles T. Miser was elected as a member of the House of Representatives of the General Assembly at the same times and at the same elections as the said Elmer C. Weller. He also served in the 84th and 85th Sessions of the General Assembly as did the said Weller, and collected his salary in the same amounts and at the same times as did the said Weller; that on October 1, 1945, said relator was appointed by the State Highway Commission of the State of Indiana as Superintendent of Maintenance at a stipulated monthly salary; that he served as such superintendent from the date of his appointment to and including January 8, 1947. Before the opening of the 85th Session of the General Assembly, to-wit: on January 8, 1947, he resigned his position as such superintendent; that after the close of said session, to-wit: March 18, 1947, he was reappointed to said position of Superintendent of Maintenance at a stipulated monthly salary and resumed the performance of his duties and is still employed in this position; that as such superintendent he is under the direction and orders of the State Highway Commission and has the supervision of the maintenance of the state highways, which maintenance requires the service of approximately 2,500 employees and is authorized by the Commission to employ and discharge personnel below the district or sub-district

level. He is also authorized to prepare plans and specifications for highway maintenance.

It is further stipulated that the relator, Beecher Conrad, was elected as a member of the House of Representatives of the General Assembly at the same times and at the same elections as the said Weller and Miser were so elected, and also served along with them in the 84th and 85th Sessions of the General Assembly, and collected his salary in the same amounts and at the same times as they collected theirs; that on July 1, 1945, he was appointed as a barber inspector by the State Board of Barber Examiners of the State of Indiana at a stipulated monthly salary and has performed his duties continuously from the date of his appointment to and including Januray 8, 1947; that before the opening day of the 85th Session of the General Assembly, to-wit: on January 8, 1947, he resigned his position as such barber inspector; that on April 1, 1947, said Board of Examiners reappointed him as such barber inspector at a stipulated monthly salary and he has ever since said date, continued to perform the functions of said inspector; that his duties as such inspector, as appears in the minutes of a certain meeting of said Board beginning June 18, 1945, were to conduct inspections of barber shops located in territories assigned to such inspector by the Board and to make written reports to the Board as to his inspections.

It is admitted also, that during all the time since the reappointment of each of the relators, as above set out, the respective positions and the salaries fixed therefor, have been a part of the payroll appropriation law; that there has been duly appropriated by the Legislature from the general funds of the State of Indiana, and there has at all times been available and on hand

by the State, funds for the payment of relators' respective salaries.

The records also disclose that each of these relators was employed at the pleasure of those making the appointment and for an indefinite period; that they resumed the performance of their respective duties without taking an oath of office or being required to furnish bond for the performance of their duties and that none of them has been requested by his employer to take such oath or furnish bond. Each relator has requested the respondent, Alvan V. Burch, as Auditor of the State, to issue warrants for his salary accrued since his reappointment, which request as to each relator has been, and still is, refused by said respondent although each relator has satisfactorily performed the services for which he was hired.

The selection and powers and duties of the Secretary of the Flood Control and Water Resources Commission are provided for as follows:

> "The secretary and the chief engineer of the commission shall be employees, selected and their compensation fixed by the commission with the approval of the governor, to serve during the pleasure of the commission. The secretary shall prepare and keep the minutes of all meetings, and a record of all proceedings, orders and transactions of the commission, and of the executive committee, have custody of all the records of the commission and executive committee, which shall be kept and maintained in the office of the commission, and perform such other duties as the commission may direct." § 27-1106 Burns' 1933, 1945 Supp.

The selection and employment of Elmer C. Weller by the Public Service Commission, is authorized by § 54-118 Burns' 1933, 1947 Supp., which provides:

> "The Commission is authorized to employ such counsel or attorneys, engineers, examiners, ex-

perts, clerks, accountants and other assistants as it may deem necessary, at such rates of compensation as it may determine upon, subject, however, to the approval of the governor."

The position of relator, Charles T. Miser, as Superintendent of Maintenance of the State Highway Commission, is provided for by § 36-168 Burns' 1933, 1947 Supp. The applicable portion of said section is as follows:

"As soon as practicable after the first meeting of the commission, the commission shall appoint: . . . the chief of the division of maintenance, known and designated in this act as 'superintendent of maintenance,' who shall be a competent civil engineer, experienced and skilled in highway and bridge maintenance and repair; . . . The superintendent of maintenance acting under the direction of the commission shall have supervision of matters pertaining to highway and bridge maintenance and improvement . . . the superintendent of maintenance . . . shall perform such other duties as may be prescribed by the commission."

This section further provides that such superintendent shall serve at the pleasure of the commission.

As to the position of the relator, Beecher Conrad, we find nothing in our statutes providing for the position of barber inspector. Under the act creating the Board of Barber Examiners, § 63-301 Burns' 1933, 1943 Repl., et seq., we find § 63-322 which, among other things, provides:

"The board shall have authority to employ not less than four (4) and not to exceed eight (8) registered barber deputies, not to exceed two (2) stenographers, not to exceed two (2) clerks and fix their compensation, to be paid from the barber fund, as it may deem necessary to carry out the provisions of this act; provided, that all deputies

appointed shall work under the direct supervision of the board."

We cannot say, from the record before us, that the said Conrad was appointed as a deputy member of the Board. In the absence of such showing we cannot presume that he is a deputy. *State of Montana ex rel. Barney* v. *Hawkins* (1927), 79 Mont. 506, 257 Pac. 411. We must assume that he was acting as a clerk as provided by the last mentioned section, as his duties were certainly not those of a stenographer.

After examining the foregoing stipulations and statutes, we agree with the appellants that their jobs, all as above described and provided for, are not public offices, nor do they in their respective positions, perform any official functions in carrying out their duties in these respective jobs; they were acting merely as employees of the respective commission or boards by whom they were hired.

In performing their respective jobs none of these relators were vested with any of the functions pertaining to sovereignty. ". . . An office is a public charge or employment, in which the duties are continuing, and prescribed by law and not by contract, invested with some of the functions pertinent to sovereignty, or having some of the powers and duties which inhere within the legislative, judicial or executive departments of the government, and emolument is a usual, but not a necessary element thereof." *Wells* v. *State* (1911), 175 Ind. 380, 94 N. E. 321.

See also *Shelmadine* v. *City of Elkhart* (1921), 75 Ind. App. 493, 129 N. E. 878; *Tucker* v. *State* (1941), 218 Ind. 614, 35 N. E. 2d 270; *Freyermuth* v. *State ex rel. Burns* (1936), 210 Ind. 235, 2 N. E. 2d 399; *State ex rel. Wickens, Prosecutor* v. *Clark* (1935), 208

Ind. 402, 196 N. E. 234; *State ex rel. Coffing* v. *Abolt* (1934), 206 Ind. 218, 189 N. E. 131. See also Note, 53 A. L. R. 595 as to distinction between office and employment.

The respondent has refused to issue warrants for the payment of these salaries in question because he contends, under the Constitution of Indiana, the relators are disqualified from serving in their respective capacities while at the same time being members of the General Assembly. His contention is predicated on § 1 of Art. 3 of the Constitution of Indiana which reads as follows:

"The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments shall exercise *any of the functions of another*, except as in this Constitution expressly provided." (Our italics.)

It being established that each of the relators is a member of the General Assembly, and that each of them is now employed in the administrative department of government in a non-official job, it now becomes necessary for this Court to determine what is the meaning of the phrase "any of the functions of another," as set out in the above quoted section of the Constitution.

In order to properly determine the meaning of the said § 1 of Art. 3, we should consider the purpose which induced its adoption. 11 Am. Jur., Constitutional Law, § 62; 50 Am. Jur., Statutes §§ 303, 305. It has to do solely with the separation of powers. Separation of powers has been one of the paramount purposes to be accomplished by our

various State Constitutions and our Federal Constitution. All of our State Constitutions, so far as we can discover, as well as the Constitution of the United States, contain provisions to guarantee the separation of powers similar to those contained in said Art. 3 of our Constitution.

As reasons why the principle of separation of powers has been so generally approved and adopted, we have decided, as was done in the case of *Saint* v. *Allen* (1930), 169 La. 1046, 126 So. 548, to quote from The Federalist, Vol. 1, p. 51 (Hamilton or Madison) pp. 353, 354, viz.:

> "In order to lay a due foundation for that separate and distinct exercise of the different powers of government, which to a certain extent is admitted on all hands to be essential to the preservation of liberty, it is evident that each department should have a will of its own, and consequently should be so constituted that the members of each should have as little agency as possible in the appointment of the members of the others. . .
>
> "It is equally evident that the members of each department should be as little dependent as possible on those of the others, for the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the Legislature in this particular, their independence in every other would be merely nominal."

And again in the same volume, p. 340, No. 48, the intention of Madison, viz.:

> "As the legislative department alone has access to the pockets of the people, and has in some constitutions full discretion, and in all a prevailing influence over the pecuniary rewards of those who will fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former."

And in No. 57 at page 338 of the same volume, we find Madison's admonition with regard to the preservation of each department of government, viz.:

"It is equally evident that, in reference to each other, neither of them ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers. It will not be denied that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it."

In the case of *O'Donoghue* v. *United States* (1933), 289 U. S. 516, 77 L. ed. 1356, 53 S. Ct. 740, at page 1360 of the Law Edition, Mr. Justice Sutherland, speaking for the court in words which cannot be surpassed, had this to say as to the distribution and separation of powers as provided by the Federal Constitution:

"The Constitution in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, . . . namely, to preclude a commingling of these essentially different powers of government in the same hands. . . .

"If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, *but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments*. James Wilson, one of the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each de-

partment required that its proceedings *'should be free from the remotest influence, direct or indirect, of either of the other two powers.'* 1 Andrews, Works of James Wilson (1896) p. 367. And the importance of such independence was similarly recognized by Mr. Justice Story when he said that in reference to each other, neither of the departments *"ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers.'"* (Our italics.)

The Court of Appeals of New York has had before it a case which required it to determine whether the word "function," as used in a New York statute, applies only to officers or whether it also applies to employees performing duties not involving the exercise of sovereignty. The case is *People* v. *Salomon* (1914), 212 N. Y. 446, 106 N. E. 111, 113. One Daniel Rooney was a process server in the office of a district attorney, and an order for the examination of a party in supplementary proceedings was granted and delivered to Rooney to serve. Defendant was convicted of an attempt to commit the crime of bribery because he offered to pay Rooney a consideration to postpone service of the order. The question was whether the acts of defendant were made a crime by a section of the Penal Law of New York, which requires that the offer to give a bribe must be made "To a person executing any of the functions of a public office." After disposing of other questions, the Court of Appeals of New York said, "We are next to inquire: (a) Was Rooney a person executing any of the functions of a public office?" And the Court answering used the following language:

"Rooney, while not a public officer, was an employe or a subordinate appointed by the district attorney for the performance of such work in the

office of the district attorney in the nature of process serving or clerical work as he might be called upon to perform. It was the duty of the district attorney to enter judgment upon the forfeited recognizance and take proceedings by law to collect the same by execution and proceedings supplementary thereto, and while, under the provisions of the Code, any adult was qualified to make due service of an order in supplementary proceedings, the district attorney, in the institution of the proceeding and conduct of the same, and in procuring the service of the order, was acting in the performance of duty imposed upon him, not as an individual but as a public officer in the performance of such duty, and anything necessary to complete performance thereof would of necessity be a function of the office held by him; i.e., a public office.

"Function" is defined by the Century Dictionary as 'that which one is bound or which it is one's business to do; business; duty; employment.' It was a function of the office of the district attorney to collect the judgment recovered in favor of the people. The duty thus imposed by law extended to every employment essential to a complete performance thereof. Had the district attorney, as a public officer, undertaken the task of personally serving the order on the judgment debtor, he would still be engaged in executing the functions of a public office, not because he was the district attorney, but by reasons of his act in carrying out the obligation imposed upon the office occupied by him; and if, in the personal attempt by the district attorney to serve such order, a bribe had been offered him, would it be a defense to the charge that service might have been made by an adult?

"The district attorney is authorized to appoint and employ subordinates to aid him in the discharge of the obligations of said office, and may delegate to an appointee certain employment in such office, and, so far as the labor of said appointee is conducive to the carrying out of the duty imposed upon the office of the district attorney, it seems to us that it is the business and employment of said office and a function thereof,

and the *appointee or employe performing such
duty is thereupon executing the functions of that
public office."* (Our italics.)

The case of *Saint* v. *Allen, supra,* is very similar
to the case which we are now considering. This was
a suit brought on behalf of the State of Louisiana by
two taxpayers to prevent persons holding office in one
of the departments of the state government from be-
ing employed to exercise powers or functions belong-
ing to another of the three departments. The facts
disclosed that among others, there were three state
senators employed by the State Highway Commission
on a monthly salary; one as an attorney, one as chief
enforcement officer, and the other as assistant to the
general maintenance superintendent.

Section 1 of the Constitution of Louisiana provided
that the powers of government should be divided into
three distinct departments: legislative, executive and
judicial. Section 2 provided that "No one of these
departments, nor any person or collection of persons
holding office in one of them, *shall exercise power
properly belonging to either of the other,* except in
the instances hereinafter expressly directed or per-
mitted." (Our italics).

As was done in the cases before us, counsel for the
defense in that case argued that the three mem-
bers of the Legislature so employed by the highway
commission, were not "exercising power" belonging to
the executive department; they were not officers, but
only employees of the highway department. In
answering this contention and in deciding for the
plaintiffs, the Court stated:

". . . The language of article 2 of the Con-
stitution, however, leaves no doubt that it is not
a law against dual office holding. It is not neces-
sary, to constitute a violation of the article, that

a person should hold office in two departments of government. It is sufficient if he is an officer in one department and at the same time is employed to perform duties, or exercise power, belonging to another department. The words "exercise power," speaking officially, mean perform duties or functions."

It will be noted that § 2 of the Louisiana Constitution provides that an office holder in one department shall not exercise *power* properly belonging to either of the other departments, while § 1, Art. 3 of our Constitution instead of the word "power" uses the word "functions."

It is interesting to note that when this particular article of our Constitution was reported in its original form by the committee on miscellaneous provisions on January 21, 1851, the word "power" was contained therein instead of the word "functions." 1 Kettleborough, *Constitution Making in Indiana* 309; *Convention Journal* 1850 p. 732. It would seem to us that these two words are interchangeable but, if there is any distinction, the term "functions" would denote a broader field of activities than the word "power."

In view of the fact that it is obvious that the purpose of all these separation of powers provisions of Federal and State Constitutions is to rid each of the separate departments of government from any control or influence by either of the other departments, and that this object can be obtained only if § 1 of Art. 3 of the Indiana Constitution is read exactly as it is written, we are constrained to follow the New York and Louisiana cases above cited. If persons charged with official duties in one department may be employed to perform duties, official or otherwise, in another department the door is

opened to influence and control by the employing department. We also think that these two cases are logical in holding that an employee of an officer, even though he be performing a duty not involving the exercise of sovereignty, may be and is, executing one of the functions of that public office, and this applies to the cases before us.

In making this decision we are not unmindful of the fact that in one jurisdiction at least an opposite result has been reached. See *State of Montana ex rel. Barney* v. *Hawkins, supra.* Nor have we overlooked the fact that the questions now confronting us were touched upon by this Court in the case of *Branham* v. *Lange, Auditor, etc.* (1861), 16 Ind. 497. There our Legislature in 1861, had appropriated the sum of $1,-000,000 to defray the expenses growing out of the civil war and other purposes. By the same act a committee composed of three members of the Legislature was set up as an auditing committee to examine the accounts for war expenses to be paid out of this fund. This committee was given well defined powers. The time and place of their meetings were provided and their salary of three dollars per day, for the days they were necessarily employed, was also fixed; and without their audit the Auditor of State was prohibited from paying any of these accounts. The Auditor of State refused to pay one of the members of this committee his compensation as such member; he, thereupon, brought his action in mandate to compel payment. As a defense, among others, the respondent auditor contended that the involved statute was in violation of said Art. 3 of the Constitution, for the reason that it provided for a commitee composed of members of the legislative department to perform

administrative duties. Without stating any reasons, and after holding the members of this committee were not officers in performing this single job of auditing, this Court held that all of the respondent's contentions were without merit; to the extent, if at all, that this case seems to be in conflict with the position taken in this opinion, the same is hereby overruled.

Appellants each contend that even though the Constitution prohibits their employment they occupy these positions as "de facto public employees" as they have acted without dishonesty or fraud, and that they should be allowed to recover as such "de facto employees." All the cases cited by the appellant in support of this position have to do with de facto public officers. We do not know of de facto or de jure public employees. For a discussion of the right of a de facto officer to recover salaries or other compensation from the public see 43 Am. Jur., Public Officers, § 488, p. 237; Note 151 A. L. R. 952. Also *Edington* v. *Bd. of Commrs. Martin County* (1938), 105 Ind. App. 156, 13 N. E. 2d 895.

The state and the public are interested in having a public office filled; hence the reason for recognizing de facto officers. This reason does not apply to public employees who are not officers and the law applicable to de facto officers has no application to employees in the situation that the appellants now find themselves. We know of no case that holds that where a person is barred by the Constitution from lawfully performing services for which he seeks payment, that payment of salary on a de facto basis is warranted; to the contrary see *Bailey* v. *Turner* (1921), 108 Kan. 856, 197 Pac. 214.

In view of the conclusion we have reached it is un-

necessary for us to determine whether or not the action of mandate will lie in a case such as the ones before us; nor, for the same reason, will it be necessary to consider the cross errors assigned herein by the appellee.

Judgment in each case is affirmed.

O'Malley, J., concurs in the result.

Emmert, J., dissents.

NOTE.—Majority Opinion reported in 80 N. E. 2d 294.

O'MALLEY, J.—I concur in the result reached in the majority opinion, but believe that something should be added.

Under the majority holding this court does not attempt to disturb prior holdings based on the doctrine of stare decisis. If the appellants performed services for the State of Indiana under a contract of employment, which contract was not in violation of Section 1 of Article 3, as that instrument was construed in the case of *Branham* v. *Lange, Auditor, etc.* (1861), 16 Ind. 497, then the construction placed on that section of the Constitution of Indiana by the majority opinion in this case, could not be held to impair such contractual rights. *Swank et al.* v. *Tyndall et al.* (1948), *ante* 204, 78 N. E. 2d 535.

In the above case this court held that "a decision overruling a prior decision as to the construction of a statute is retroactive to the time of the enactment of the statute." It is also held that the same rule applies to the construction of constitutions. It likewise was held in the Swank case, *supra,* that a change in the construction of a statute or of the constitution could not impair vested rights which rest on contract.

In the instant case, it could not be held that rights protected by the above rule, could be enforced by means of mandate.

NOTE.—Concurring Opinion reported in 80 N. E. 2d 303.

## DISSENTING OPINION.

EMMERT, J.—I agree with the majority opinion that the relators, Clyde R. Black, Elmer C. Weller, Charles T. Miser, and Beecher Conrad, are employees of the state who do not "perform any official functions in carrying out their duties in these respective jobs"; but I feel compelled to dissent from the absurd result and the reasoning by which it is reached, which holds that each relator, as an employee, was violating § 1 of Article 3 of the Constitution of Indiana. Such result in itself violates this provision requiring separation of governmental powers by constituting this court a self-appointed guardian of the ethics of the members of the Legislature and of the executive department of this state. It is most dangerous for this court to adopt a policy of balancing the interests, which is properly used in extending the growth of the common law, as a basis for interpretation of a constitutional provision, by reasoning that whatever should be the Constitution, therefore is the Constitution for the purpose of a particular state of facts. Words and meaning become so elastic that the Constitution can mean anything, depending upon the varying concepts of constitutional power and authority entertained by a temporary majority of the court, which causes the Constitution in this case, if precedents have any force whatever, to mean one thing when applied to an employee of the state, something else to an employee of a political subdivision

of the state, and something entirely different on a question of a legislative function as delegated to an administrative authority or agency. Nor will it do to say the relators should hold but one governmental position at a time. Unless the Constitution prohibits their acts, as it does dual office holding by § 9 of Article 2 of the Constitution, such a public policy is one to be enacted by law of the Legislature and not by any judicial legislation of this court. The Legislature had adopted a statute prohibiting nepotism,[1] but it would be a usurpation of legislative power for this court by decision to declare nepotism forbidden by the Constitution. But here far more is involved than the positions held by these relators or the compensation claimed. The interpretation given becomes a precedent for the conduct of state government, and the future ability of the state to meet the varying problems of a changing economy and society may be hamstrung thereby.

The American principle of separation of the powers of government into legislative, executive, and judicial departments has caused difficulty when considered by the courts, both federal and state, because in practical operation it has been found impossible to separate the powers and maintain a high and impenetrable wall which prohibits any coordinate cooperation for the ends of government. The specific provision separating the powers of government in the Indiana Constitution of 1851 is contained in § 1, Article 3, which provides:

> "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

[1] § 49-302 Burns' 1933 (Supp.), Acts 1941, ch. 16, § 1, p. 49.

The controversy arises over the meaning of the word "function," and the history of its adoption is of value in determining the meaning of the term.

Article 2 of the 1816 Constitution of Indiana separated the powers as follows:

> "The powers of the government of Indiana, shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judiciary, to another: And no person, or collection of persons, being of one of those departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

The committee on miscellaneous provisions in the Constitutional Convention of 1851 referred to the convention for its adoption the same paragraph as the Constitution of 1816. On Friday, January 31, 1851, this section was passed on second reading and was referred to the Committee on Revision, Arrangements, and Phraseology. This committee was composed of the chairmen of the various other committees with the distinguished Robert Dale Owen of Posey County as its chairman. It was numbered Section 55 at the time it was referred to the committee. However, when it was reported back by the Committee on Revision, Arrangements, and Phraseology it was placed in the Constitution as § 1 of Article 3, and the language had been changed to its present form, *supra.*

Article 3 as finally adopted was less broad in its scope than Article 2 of the 1816 Constituiton. The words "And no person, or collection of persons, being of one of those departments," had been changed to "and no person, charged with *official duties* under one of these departments," (italics added) which made it clear

that the drafters were concerned with official duties of the state. The word "duties" is more broad than powers, because the power may exist without a duty, but a duty would not exist without the power being implied to execute the same. In order to avoid redundancy the words "official duties" are not repeated, but the word "functions" was used. The forefathers were too practical to have intended by the use of the ambiguous word "functions" to hamstring the operation of state government. Our form of government was modeled after the federal Constitution, and there had already been decisions by the United States Supreme Court that the separation of powers meant the separation of exclusive and necessary official powers. In *The State, ex rel. Yancey* v. *Hyde* (1889), 121 Ind. 20, 25, 22 N. E. 644, this court held, in dealing with the power of appointment that: "The word 'function,' as here used, means duty; and the clause may be read, 'and no person charged with official duties under one of these departments shall exercise the duties of another, except as in this constitution expressly provided.' This constitutional provision is easily understood; it is clear and concise in expression." Other decisions hereinafter noted by their holding make it clear that the prohibition was against an exclusive and necessary exercise of *official power* and duty of the state. This construction is further supported by the fact that the first clause of the article divides "powers of government." Of course any "power of government" is an official power.

The proceedings of the convention itself give a practical construction of the 1816 Constitution on separation of powers. Jacob B. Chapman, one of the delegates from Marion County, was the state printer, which fact he early called to the attention of the con-

vention in connection with the controversy which arose as to whether or not he was entitled to do printing for the convention. 1 Convention Debates 22 (1850). He claimed to be an officer of the state, and later this court in *Ellis* v. *The State* (1852), 4 Ind. 1, 3, said: "It was competent for the legislature to make the state printer an officer, and we think they have done so in this state." No question was ever raised that the state printer was ineligible to sit in the Convention of 1850 or that by reason of the separation of powers he as state printer was an administrative officer and so ineligible to act in a legislative capacity by being a participating member in the Constitutional Convention. If the position be taken that the Constitutional Convention of 1850 was not a part of the legislative department strictly speaking, yet its work was legislative in character, and there was never any question raised in the convention that the state printer was acting in any unethical manner in voting on all other matters except the determination of who should do the printing for the convention.

Within ten years after adoption of the Constitution of 1851 this court had squarely presented for its consideration a case involving the separation of governmental powers. The Special Session of the General Assembly of 1861 passed an act appropriating $1,000,-000 to defray the expenses growing out of the Civil War. The act provided for the appointment of a committee consisting of two members of the House and one of the Senate, designated as an "Auditing Committee" who were to meet at Indianapolis monthly and examine and audit the accounts of the Commissary General and Quartermaster General, and the Auditor of State was prohibited from paying any of the accounts until approved by this committee. The Audi-

tor of State refused to issue a warrant for the compensation as provided by the statute for a member of the committee. The court held members of the Auditing Committee were not officers within the meaning of the Constitution and that the auditing to be done by the committee was not prohibited by § 1 of Article 3 of the Constitution. Although the court did not state its reason for holding this article was not violated, it was an interpretation by this court, whose members were contemporaries of the Constitution, that a legislative committee could properly perform an administrative act as a condition precedent to the Auditor of State drawing his warrant upon the funds.[2] *Branham* v. *Lange* (1861), 16 Ind. 497.

Even before the Branham Case, *Supra*, this court construed § 1 of Article 3 as applying only to state government. By statute the mayor of Indianapolis was judge of the city court with the jurisdiction and powers of a justice of the peace. This court said: "After much consideration, we are of opinion that the executive and administrative duties of *Wallace* were not such as to come within those departments of the state government, as established by the constitution, and that he was, consequently, left free to be charged with official duties under either of the other departments; . . ." *Waldo* v. *Wallace* (1859), 12 Ind. 569, 579. This implied exception has been consistently followed since this case. *Baltimore, etc. R. Co.* v.

---

[2] The value of a contemporaneous construction "proceeds upon the presumption that the contemporaries of the constitution have claims to our deference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the constitution, and of the sense put upon it by the people when it was adopted by them; . . ." *Ogden* v. *Saunders* (1827), 12 Wheat 213, 290, 6 L. Ed. 606, 632.

*Town of Whiting* (1903), 161 Ind. 228, 68 N. E. 266; *Livengood* v. *City of Covington* (1924), 194 Ind. 633, 144 N. E. 416.

Unless these cases which read into § 1 of Article 3 an implied exception, exempting political subdivisions of the state from the prohibition, be overruled, the majority opinion reaches the anomalous result that a member of the Legislature may not be an employee in another department of the state, yet at the same time he may be an employee of a political subdivision of the state. He could drive a city truck, but he could not drive a state highway commission truck. The legislator becomes fish for some purposes and fowl for others. All the arguments contained in the quotations from Hamilton, Madison, Jefferson and Montesquieu quoted in *Saint* v. *Allen* (1931), 169 La. 1046, 126 So. 548, on the desirability of the independence and freedom of each department of government apply with equal force to the government of municipalities. Of course the answer is that neither the federal Constitutional Convention nor the Indiana Consitutional Conventions of 1816 and 1850 adopted the words of the philosophical writings of Montesquieu, Hamilton, Madison or Jefferson. Neither of these Constitutions purported to provide for any utopian scheme of government. The provision in these Constitutions for the separation of powers of government was contained in certain specific words, which under a long line of decisions by both the United States Supreme Court and this state, have been construed to mean not a separation of functions as broadly defined in the majority opinion, but a separation of essential and exclusive governmental powers.[3]

---

[3] " '. . . But the founders were too intensely practical to be controlled by any political theory, and, while they recognized

Practically the entire growth in the field of administrative law has been based upon a delegation of legislative power to administrative agencies, and regardless of what names the various courts may have given the agency in order to explain the permitted merging of powers, nomenclature cannot change the facts when legislative functions are delegated to an administrative department, which in Indiana is included in the executive department. The power to tax, the power to make rates for public utilities, and the power to make rules and regulations are each legislative in nature and are certainly legislative functions. A portion of the power of the legislature is delegated in each instance where these matters are finally determined by

the principle in constructing the framework of the government, they violated it in practice and so distributed the powers as to create a system of checks and balances. See Mason, Veto Power. The principle formulated by Montesquieu still lies at the base of most political organizations of the present day, but during the last century the tendency of political science has been to discard it in its extreme form, because, as said by Goodnow: "It is incapable of accurate statement, and because it seems to be impossible to apply it with beneficial results in the formation of any concrete political organization. The flaw in Montesquieu's reasoning and in that of his followers was in the assumption that the expressions of the governmental power by different authorities were different powers." Goodnow, Adm. Law, 20, 21. The recent tendency of legislatures and courts is commented on by Justice Brown in State ex rel. Jonason v. Crosby (1904), 92 Minn. 176, 99 N. W. 636. The present attitude of the courts towards questions arising under this constitutional provision is well expressed by the supreme court of North Carolina: "While . . . the executive, legislative, and supreme judicial powers of the government ought to be forever separate and distinct, it is also true that the science of government is a practical one. Therefore, while each should firmly maintain the essential powers belonging to it, it cannot be forgotten that the three co-ordinate parts constitute one brotherhood, whose common trust requires a mutual toleration of the occupancy of what seems to be a 'common because of vicinage' bordering on the domains of each." Brown v. Turner (1874), 70 N. C. 93, 102.'" 79 L. Ed. 477.

an administrative agency. Annotation, 79 L. Ed. 474, *et seq.;* Public Administrative Law, 42 Am. Jur. 281, *et seq.;* 51 C. J. 12, 13, § 27; 12 C. J. 851, § 338. Mr. Justice Story realized the federal Constitution did not adopt any utopian scheme of government as expressed in the words of Montesquieu, or his disciples in this country, in adopting the federal Constitution. In 1833, he wrote:

> "But when we speak of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution. . . ."
> 1 Story, *Const.* § 525 (5th ed.).

Chief Justice Marshall expressed the same construction in the following language:

> "It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. *But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself.* . . . The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest in which a general provision may be made and power given to those who are to act under the general provisions, to fill up the details. . . ."
> *Wayman et al.* v. *Southard et al.* (1825), 10 Wheat (U. S.) 1, 43, 6 L. Ed. 253, 263. (Italics added.)

The United States Supreme Court has often recognized the right of Congress to delegate a legislative function to another department of government. Under § 3 of an Act of Congress, March 2, 1897, entitled "An Act to Prevent the Importation of Impure and Unwholesome Tea," the Secretary of the Treasury was authorized to "fix and establish uniform standards of purity, quality, and fitness for consumption of all kinds of teas imported into the United States" and to prohibit imports not equal to such standards. In *Butterfield* v. *Stranahan* (1904), 192 U. S. 470, 496, 48 L. Ed. 525, 536, Mr. Justice White, speaking for the court, said:

> ". . . Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. *To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted.*" (Italics added.)

This certainly was a legislative duty and a legislative function.

In *Field* v. *Clark* (1892), 143 U. S. 649, 694, 36 L. Ed. 294, 310, the United States Supreme Court quoted with approval from Locke's App. 72 Pa. 491, as follows:

> " 'To assert that a law is less than a law, because it is made to depend on a future event or act, is to rob the Legislature of the power to act wisely for the public welfare whenever a law is passed relating to a state of affairs not yet developed, or to things future and impossible to fully know.' The proper distinction the court said was this: 'The Legislature cannot delegate its power

to make a law; *but it can make a law to delegate a power* to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' " (Italics added.)

Again in *Honolulu Rapid Transit & L. Co.* v. *Hawaii* (1908), 211 U. S. 282, 290, 291, 53 L. Ed. 186, 188, the same court, in considering the law vesting in the governor and superintendent of public works the right to make rules and regulations for the maintenance and operation of a street railway, said:

"The business conducted by the transit company is not purely private. It is of that class so affected by a public interest that it is subject, within constitutional limits, to the governmental power of regulation. This power of regulation may be exercised to control, among other things, the time of the running of cars. It is a power legislative in its character, and may be exercised directly by the legislature itself. *But the legislature may delegate to an administrative body the execution in detail of the legislative power of regulation.* Reagan v. Farmers' Loan & T. Co. 154 U. S. 362, 393, 394, 38 L. ed. 1014, 1022, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047; Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co. 167 U. S. 479, 494, 42 L. ed. 243, 251, 17 Sup. Ct. Rep. 896. We need not consider whether that legislative power may be conferred upon the courts of the territory, as it may be upon the courts of a state, so far as the Federal Constitution is concerned. Prentis v. Atlantic Coast Line Co. 211 U. S. 210, ante, 150, 29 Sup. Ct. Rep. 67. *In this case the legislative power of regulation was not intrusted to the courts. On the contrary, it was clearly vested, by § 843, in the governor and the superintendent of public works. . . .*" (Italics added.)

The right of the Legislature to delegate legislative functions or powers which are not exclusively essential legislative powers has often been recognized. The power of taxation is recognized as legislative. "The taxing power is a legislative function, and the fixing of levies, the assessment of property and collection of taxes is generally considered and spoken of as administrative action *which is an incident of the legislative power.*" (Italics added.) *Peden et al.* v. *Board of Review of Cass County* (1935), 208 Ind. 215, 220, 195 N. E. 87. Under § 60-319 Burns' 1943 Replacement, the State Board of Finance, an administrative agency, has the right to fix and determine the state levy. This practice has never been successfully questioned in this state.

Numerous decisions recognizing the authority of the Legislature to delegate legislative functions to administrative agencies have occurred in cases regulating public utilities.

In *Southern Ind. R. Co.* v. *Railroad Com., etc.* (1909), 172 Ind. 113, 123, 87 N. E. 966, this court said:

> "The decisions seem to hold that, as the state *legislature possesses the power to regulate the business of railroads, it may delegate that power to a commission,* or other administrative body, and what such administrative agent does, within the powers with which it is endowed, is as valid and conclusive as if done by the legislature itself. *Atlantic Coast Line R. Co.* v. *North Carolina Corp. Com., supra,* and cases cited on page 19; *Southern R. Co.* v. *Railroad Com., etc., supra;* Joyce, *Franchises,* § 381." (Italics added.)

In *Chicago, etc., R. Co.* v. *Railroad Com., etc.* (1911), 175 Ind. 630, 643, 95 N. E. 364, where the appellant contended the statute creating the Railroad Commission of Indiana was in conflict with Article 3 of the

Indiana Constitution, the court quoted with approval *Prentis* v. *Atlantic Coast Line Co.* (1908), 211 U. S. 210, 53 L. Ed. 150, 29 Sup. Ct. 69, as follows:

" 'But we think it equally plain that the proceedings drawn in question here are legislative in their nature, and none the less so that they have taken place with a body which at another moment, or in its principal or dominant aspect, is a court such as is meant by § 720. . . . *The establishment of a rate is the making of a rule for the future, and therefore is an act legislative not judicial in kind.*' " (Italics added.)

Again in *State ex rel.* v. *Lewis* (1918), 187 Ind. 564, 568, 569, 120 N. E. 129, this court clearly recognized the nature of such regulation in the following language:

"The real question for decision involves an examination of certain sections of the act of 1913, *supra* (§ 10052a *et seq.* Burns' 1914), creating the Public Service Commission, and to which it must look for its duties and its authority. *The Public Service Commission is not a legislature, although when exercising its rate-making power it is performing a legislative act.* It is not a court, yet in certain matters its acts, in a sense, are quasi-judicial. More strictly speaking, it is an administrative body, charged with ministerial and in some instances with legislative duties (4 R. C. L. 623) ; or, in other words, it is a legislative agency, assumed to be qualified by knowledge and experience to regulate the public utilities of the state with reasonable fairness and substantial justice, not only to the public, but to the utility as well. Such is the theory of the law, and, unless conscientiously administered, its purpose is destroyed." (Italics added.)

In *City of Logansport* v. *Public Service Comm.* (1931), 202 Ind. 523, 533, 177 N. E. 249, this court again held:

> *"The regulation of rates to be charged by public utilities is properly the function of the legislative department of the state government, under its police power,* Pond, Public Utilities (3d ed.) 519-520; *Winfield* v. *Public Service Commission, supra; City of Washington* v. *Public Service Commission* (1921), 190 Ind. 105, 129 N. E. 401; *Hockett* v. *State* (1885), 105 Ind. 250, 5 N. E. 178; *Smyth* v. *Aymes* (1897), 169 U. S. 466. . . ." (Italics added.)

The right of the Public Service Commission to establish reasonable rates as a legislative function was acknowledged in *Indianapolis Water Co.* v. *Moynahan Prop. Co.* (1935), 209 Ind. 453, 454, 198 N. E. 312, in which the court said:

> ". . . *Rate making is a legislative function* in which the courts are not concerned so long as rights guaranteed by the Constitution are not invaded, except to see *that delegated powers are lawfully exercised.* . . ." (Italics added.)

The right of the Legislature to delegate legislative power to the Department of Financial Institutions of Indiana was affirmed by this court in *Financial Aid Corporation* v. *Wallace* (1939), 216 Ind. 114, 120, 23 N. E. 2d 472, in which the court clearly stated legislative power has been delegated as follows:

> "As pointed out in *Blue* v. *Beach, supra,* the Legislature cannot delegate the power to make a law, *but it can make a law to delegate a power* to determine facts upon which the law makes its own action depend. . . ." (Italics added.)

This court should not give the word "functions" as used in § 1 of Article 3 of the Constitution one sort of meaning in one class of cases, and an entirely different meaning in this appeal. Admittedly, the term as used in the Constitution is not exact but previous cases

of this court by decisions have interpreted the word "functions" to mean a necessary, essential, and exclusive official power and duty of the state. In view of these decisions the case of *Saint* v. *Allen, supra,* has no persuasive value in the construction of our own particular constitutional provision.

The fallacy of the Saint Case is that it adopts the written philosophy of Montesquieu, Madison and Jefferson as a major premise for syllogistic mathematical logic. Constitutional provisions when so interpreted soon become an absurdity. The Saint Case is a typical example of the oft quoted maxim "hard cases make bad law." Baldly stated, it reasons that whatever should be the Constitution, therefore is the Constitution. No process could be better calculated to destroy any written Constitution. No written Constitution can be the common law subject to expansion or contraction by court made law. It is often of value to determine the reason behind any constitutional provision, but the statements of the contemporaries for the reasons do not become the written words as adopted in the Constitution. The danger always lies in making such reasons the sole and exclusive standard for interpretation. The statement of the court that, " 'The words "exercising power," speaking officially, mean perform duties or functions,' " is not supported in the case by either reason or authority. Certainly the word "function" as many times decided by the Indiana cases, *supra,* does not have the meaning used in the Saint Case.

Nor do the cases interpreting criminal statutes of other jurisdictions furnish any persuasive precedent for the construction of our Indiana Constitution. The case of *People* v. *Salomon* (1914), 212 N. Y. 446, 106

N. E. 111, involved a criminal statute wherein the Legislature prohibited acts which interfered with the administration of government. Even in this case two of the judges dissented, and a third did not participate. The General Assembly of Indiana could pass an act making it a penal offense to interfere with any function of state government, and make it clear, either from the context of the act or by a specific definition of the term, that the word "function" would mean any act whatever concerned with government, but in this appeal we are not dealing with a statutory definition of the word "functions." The Legislature in this case could have prohibited by statute any one of its members from being an employee either of the legislative or executive department of the state, but it has not done so, and this court has no business engaging in judicial legislation in the matter. Within the past generation this court has too often engaged in judicial legislation by nullifying the plain meaning of statutes or by giving them a meaning in violation of the clearly expressed legislative intent.

Since *People* v. *Salomon, supra,* did not deal with an interpretation of separation of powers under the Constitution of New York, its value as a precedent for the purposes of this appeal is absent. However, when the Court of Appeals of New York did deal with a constitutional question of the separation of powers, it held that legislative functions could be delegated to administrative agencies.[4] In considering Chapter 737 of the Acts of 1905 of the State of New York, which delegated to a commission the authority to determine

---

[4] Separation of powers under the Constitution of New York are as follows: "The legislative power of this state shall be vested in the Senate and Assembly." Article 3 of § 1, Constitution 1846; "The executive power shall be vested in a governor . . ." Article 4 of § 1, Constitution 1846, amended 1894.

the maximum price to be charged for services by gas and electric light companies, the court said:

> ". . . This review of the course of legislation and of the judicial authorities in this state, I think, clearly shows that while powers inherently and exclusively legislative cannot be delegated, there is a large field in which the legislature, to quote Chief Justice Marshall's words, 'may certainly delegate to others powers which the legislature may rightfully exercise itself.'" *Vil. of Saratoga Spgs.* v. *Saratoga G., etc., Co.* (1908), 191 N. Y. Rep. 123, 138.

This case was approved in *People ex rel. C. P., etc. R. R. Co.* v. *Willcox* (1909), 194 N. Y. Rep. 383, 386, 87 N. E. 517, which interpreted the prior case to hold, "that the function of rate making could be devolved by the legislature upon other officers, but that the very question of what rates are reasonable could be given a judicial or *quasi* judicial aspect."

The facts in *State ex rel. Barney* v. *Hawkins et al.* (1927), 79 Mont. 506, 257 Pac. 411, are very similar to those involved in this appeal. Mr. Justice Myers, speaking for the court, summarized the facts as follows:

> "Grant Reed is and, at the time of the commencement of this action, was a representative in the Montana legislature. His term of office as representative will expire, at noon, the first Monday in January, 1929. By appointment of the Board of Railroad Commissioners of Montana, made while he was a representative in the legislature, Reed is and, at the time of the commencement of this action, was holding a position designated as auditor for the Board of Railroad Commissioners and its ex-officio commissions, at a salary, fixed by the board, of $225 per month, which he is and has been and, at the time of the commencement of this action, was drawing from the state of Montana, for his services as such auditor; except that he did

not fill such position of auditor or draw the salary thereof while sitting and serving as a representative during the recent session of the legislature but resumed his position of auditor at the end thereof."

Article 4 of the Constitution of Montana provided:

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

A taxpayers suit was commenced to enjoin payment of Reed's salary during the remainder of his legislative term. The court held that Reed did not violate the constitutional prohibition since he was only an employee. In the conclusion of the case the court said:

". . . we hold that Grant Reed does not hold a civil office under the state; that the position he holds does not possess a delegation of a portion of the sovereign power of government. In our opinion, he is only an employee; holding a position of employment, terminable at the pleasure of the employing power, the Board of Railroad Commissioners. We hold this appointment not violative of section 7 of Article V of the Constitution. That being the case, he has, in himself, by virtue of his appointment, no powers properly belonging to the judicial or executive department of the state government, for he is wholly subject to the power of the board, and, having no powers, he can exercise none; and, therefore, his appointment was not violative of Article IV of the Constitution."

The difficulty with the majority opinion is that it seeks to impose upon the various members of the Legislature of this state ethical standards for im-

partiality which are properly required only of the judiciary. Moreover, it ill becomes this court to dictate to any member of the Legislature or a member of the executive department what his public ethics should be. This is a violation by this court of the very prohibition contained in Article 3 for the separation of powers. As early as 1856 this court in *Wright* v. *Defrees* (1856), 8 Ind. 298, held that the judiciary department could not investigate the motives of the Legislature even when fraud was charged in the enactment of a bill. This court again held, ". . . To institute such an inquiry would, as said in *Wright* v. *Defrees,* be a direct attack upon the independence of the legislature, and an usurpation of power subversive of the constitution." *McCulloch* v. *The State* (1858), 11 Ind. 424, 431. A fortiori this court has no business in prescribing any standard of ethics for members of the General Assembly.

The legislative branch of the government was never intended to act with judicial impartiality. According to the 1948 official roster of state officials, the members of the 85th General Assembly had a great diversity of occupations. This is a desirable representation for the people. It is not necessary to list all of the various occupations, but among the members were 44 engaged in agriculture, 14 as merchants, 32 as lawyers, 5 as editors or publishers, and 4 in manufacturing pursuits. Could this court say that these various members would be disqualified to vote on any proposed legislation affecting their particlar vocations? The matter of taxes may affect the pocketbook of each legislator, but he is not disqualified to vote for that reason. The value of the services of a legislator depends upon his lifetime experience, which includes what he has learned in the operation of his business or profession, and he is not

disqualified to vote according to any standard of ethics adopted by any other department of government.

Moreover, the modern philosophers of government in this country have' generally thought that the growth and vitality of our two party system was desirable for the maintenance of our republican form of government, in that it prevented the rise of numerous party organizations and blocks, such as was evidenced in France where approximately fifty political blocks were in evidence before World War II, which paved the way for the destruction of liberty. The legislator has a direct interest in his party platform and program, and the chief executive either of this state or nation, is generally regarded as the titular head of his party, who may properly exert strong influence in molding party policy, though he should not demand an abdication of legislative discretion. When the legislator is elected, he is expected to support, as a legislator, his general party principles, for that is the manner in which the citizens, in whom the ultimate power of government is vested, may govern themselves. The Governor "shall, from time to time, give to the General Assembly information touching the condition of the State, and recommend such measures as he shall judge to be expedient." Section 3, Article 5, Constitution of Indiana. The Governor does not recommend to the courts, "such measures as he shall judge to be expedient." Our scheme of government calls for a free, independent and *impartial* judiciary, but the Legislature is not a court, and its members in enacting statutes are not acting in a judicial capacity. They may properly take into consideration interests of the executive as well as the legislative department which are political in nature. The fact that an act of the Legislature offends the thinking of the court as not being an impartial politi-

cal policy should not be weighed by or influence the court.

The inescapable conclusion of the holding of the majority opinion is that the word "functions" as used in Article 3 of the Constitution means any act in behalf of or concerning government, which is done within the framework of its organization, whether it be an exercise of the highest sovereign power or the menial task of sweeping the floor. Such an interpretation was never intended by the forefathers who drafted the 1851 Constitution, and until this appeal there has been no such construction either by this court or by the practice of the officials of this state. When a public official of an administrative agency exercises a legislative function delegated to him by the General Assembly of Indiana, under the many authorities above discussed, his acts are valid and constitutional, but if the word "functions" means any act official or otherwise, his acts would be invalid. None of the relators exercised any of the sovereign power of government as mere employees of their respective administrative departments. If they had exercised acts of sovereignty, they would have been public officers, for a public officer is one who exercises some part, however small, of the sovereign power of government. None of them fixed or determined any policy of their respective departments. They exercised no official discretion. They were mere mechanical aids for other public officers in charge of their departments. Not only did they not, as public employees of their respective administrative departments, exercise any of the necessary or exclusive powers or functions of their various state departments, but they did not exercise any official power or duty whatever, for as before stated, if they had they would have been all public officers. They did

not exercise any "function" of state government. The conclusion is manifest that the employment of each relator did not violate § 1 of Article 3 of the Constitution.

The only remaining contention to be considered concerns the availability of an action of mandamus against the Auditor of State. In *Rice, Auditor of State,* v. *State, ex rel. Drapier* (1884), 95 Ind. 33, 44, this matter was settled in favor of the relators. The court held that such an action was not prohibited as a suit against the sovereign without its consent. The court said:

"Whenever the money necessary to pay a particular claim against the State has been appropriated by the Legislature, and the amount of the claim has been definitely ascertained in a manner prescribed by law, a refusal by the auditor of state to draw his warrant upon the treasurer of state for the payment of the claim will authorize the interposition of the courts by appropriate mandatory proceedings. In such a case it is not a sufficient objection that such proceedings afford an indirect method of suing the State. In general, however, since a State can not be sued in its own courts without its own legally expressed consent, the remedy by mandamus is not to be extended so as to become in effect a process against the State for the establishment of demands of an unliquidated nature, which properly fall within the cognizance of the Legislature. High, *Extraordinary Legal Remedies*, section 100, *et seq.*"

See also *Wolfe, Auditor of State* v. *The State ex rel. Kennard* (1883), 90 Ind. 16.

In this appeal each claim for salaries of the relators is liquidated, appropriations are available, no objection has been made to the correctness of the claim except on a constitutional ground, and nothing remains to be done regarding any discretion on the part of the

Auditor of State. For these reasons I feel the judgment of the trial court should be reversed.

NOTE.—Dissenting Opinion reported in 80 N. E. 2d 560.


## ON PETITION FOR REHEARING.

STARR, J.—In considering the petition for rehearing in this case we have discovered that in setting out the facts in our opinion in the appeal of Charles T. Miser, we omitted the fact that the said Miser, on March 19, 1947, resigned as a member of the House of Representatives of the State of Indiana which was his right. *The State ex rel. Cornwell* v. *Allen* (1863), 21 Ind. 516; *State ex rel.* v. *Huff* (1909), 172 Ind. 1, 87 N. E. 141. This fact is alleged in appellee's second paragraph of answer to appellant's complaint and is admitted in appellant's reply thereto. Nothing is said in any of the briefs filed herein regarding this fact. Nor does the stipulation purporting to contain all the evidentiary facts set out this fact, although it does contain the statement that appellant had resigned from his job when he qualified as a member of the General Assembly. Furthermore, appellant, in his petition for rehearing, has not complained that this court has omitted a material fact in its opinion. In justice to all the parties however, we believe it is our duty to consider and discuss this resignation even though it is not complained of.

Although said appellant resigned, as above indicated, still, in the light of all the stipulated facts, he is not entitled to judgment mandating the appellee to issue to him a warrant in the amount demanded. Having accepted his salary as a member of the General Assembly, and, by virtue of our statute, for a

period far in advance of the date of his resignation from that body, equity and good conscience should require that he return to the State the amount which he was paid for the time beyond his voluntary resignation—this he has not done or offered to do. Had this excess not been paid to him in advance, he could not have recovered same. 43 Am. Jur., *Public Officers,* § 381.

Section 49-1809 Burns' 1933, dealing with the powers and duties of the Auditor of State among other things provides: ". . . the auditor shall examine with care, every demand and claim presented for payment, and shall be satisfied, that every claim is just, legal, and unpaid, before he shall allow, audit, or countersign it." This provision is broad enough to justify the auditor in refusing to issue a warrant for money owing to one who in turn is indebted to the state, as was the case here. To compel the auditor so to do would deprive the state of its right to set-off.

This being the case it is our opinion that the question before us should be presented and settled in an ordinary action as provided by law for the collection of money wherein the state will have a right to enforce any set-off it may have. "Courts have generally been unwilling to extend the operation of this writ and its use has been kept within its own narrow limits. It will be denied, when the object sought is an adjudication upon some question or right which may as well be settled in an ordinary action or according to the usual procedure. In other words, this form of proceedings cannot be employed to adjudicate and establish a right or define and impose a duty, but only to enforce an existing legal right and the performance of a duty specifically enjoined." *State ex rel.*

v. *Foland, Auditor* (1921), 191 Ind 342, 350, 132 N. E. 674.

The petition for rehearing of each relator is hereby denied.

Emmert, J. dissents.

EMMERT, J.— (Dissenting). There has been no answer or explanation made concerning the numerous well decided authorities in this state construing § 1 of Article 3 of the Constitution of Indiana to permit, in certain instances, one department of state government to exercise "the functions of another."[1] It was never intended that there be an absolute and exclusive separation of the functions of government, and until this appeal was decided, the authorities so held.

It is not to be presumed that this court, by its own order book entries, would violate § 1 of Article 3 of the Constitution. Yet the precedent of the majority opinion would so indicate. The fixing of the salary of a public officer is a legislative function. 46 C. J. 1018, § 249; 43 Am. Jur. 138, § 345; *Arnett* v. *State, ex rel.* (1907), 168 Ind. 180, 80 N. E. 153, 8 L. R. A. (N. S.) 1192. Under Chapter 38 of the 1945 Acts (§§ 13-1401 to 13-1406) Burns' 1942 Replacement, (Supp.), the office of Public Defender was created and provision made for the operation of the office. By § 13-1404, Burns' 1942 Replacement, (Supp.), "The public defender shall be paid an annual salary to be fixed by the Supreme Court of this state, not to exceed five thousand dollars ($5,000) per year. . . ." Pursuant to this section

---

[1] "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." Indiana Constitution, art. 3, § 1.

this court has twice fixed the salary of the Public Defender. Thus we have the highest court of the judicial department of this state exercising a function of the legislative department, but it is a function which may be delegated under the rule that the prohibition of § 1 of Article 3 of the Constitution only extends to necessary and exclusive functions of the three separate departments.

It has now been brought to the attention of the court that the relator Miser resigned as a member of the House of Representatives, which was admitted in the pleadings in the trial court. The appellee contends that the relator Miser had no right to resign as a member of the House of Representatives of the General Assembly. However, it has always been recognized in this state that a public officer had a right to resign. *The State ex rel. Cornwell* v. *Allen* (1863), 21 Ind. 516; *State ex rel.* v. *Huff* (1909), 172 Ind. 1, 87 N. E. 141. The General Assembly recognized this right and practice by Chapter 119 of the 1945 Acts (§ 49-206a, Burns' 1933, Supp.) regulating the right of those in the public service, whether officers, servants or employees, to withdraw a written resignation. The Constitution places no unlimited restriction on the right of a member of the General Assembly to resign, but it does contemplate such a right in instances not prohibited. "No Senator or Representative shall, during the term for which he may have been elected, be eligible to any office, the election to which is vested in the General Assembly; nor shall he be appointed to any civil office of profit, which shall have been created, or the emoluments of which shall have been increased, during such term; but this latter provision shall not be construed to apply to any office elective by the People." Section 30, Article 4, Constitution of

Indiana. If it had been intended that a State Representative must always be a State Representative during the term to which he was elected, the constitutional convention could have said so in few words. It did make judicial officers ineligible for other state offices in clear and simple terms by Section 16 of Article 7. "No person elected to any judicial office, shall, during the term for which he shall have been elected, be eligible to any office of trust or profit, under the State, other than a judicial office." The relator Miser had the right to resign his office as a State Representative.

With the right of the relator Miser to resign his position established, I am unable to see why he should be forced to institute another lawsuit in the Superior Court of Marion County under § 4-1501, Burns' 1946 Replacement (Acts 1889, ch. 128, § 1, p. 265; 1895, ch. 112, § 1, p. 231).

The rights, powers and duties of the Auditor of State can not exceed those granted by the Constitution, which in his particular office must be determined by legislative enactment.[2] The Constitution of 1851 makes it clear that he is not given any general grant of power or authority, and he is in the same position as a statutory officer who must find his authority within the statute under which he operates, or he has no such authority. *Sherrick* v. *State* (1906), 167 Ind. 345, 79 N. E. 193; *Branham* v. *Lange* (1861), 16 Ind. 497; *Dailey* v. *State, ex rel.* (1909), 171 Ind. 646, 87 N. E. 4. The Auditor of State acts under the law and not above the law.

---

[2] "There shall be elected, by the voters of the State, a Secretary, an Auditor and a Treasurer of State, who shall, severally, hold their offices for two years. *They shall perform such duties as may be enjoined by law;* . . . (Italics supplied.) Section 1, Article 6, Constitution of Indiana.

I can not agree to a construction of § 49-1809, Burns' 1933 (Acts 1859, ch. 138, § 7, p. 227) which authorizes the auditor to exercise an arbitrary and capricious discretion in the allowance or disallowance of claims against the state. The auditor is not a court nor a quasi judicial officer. He is bound by the law the same as any other public official, and if he acts in violation of the law, he does so at his peril. In this case and all during the controversy the facts have been admitted, and when the auditor acts in violation of the law, his action is contrary to law, which, under the many decisions of this court with reference to administrative boards, bureaus, and commissions, makes his action arbitrary and capricious.

By Clause 4 of § 49-1702, Burns' 1933 (1 R. S. 1852, ch. 7, § 2, p. 146), the auditor is required to "Examine, adjust and settle the accounts of all public debtors, for debts due the state treasury, and require all such persons, or their legal representatives, who may be indebted to the state for moneys received or otherwise, and who shall not have accounted therefor, to settle their accounts." This statutory mandate required the auditor to set off the prepayment of salary made to the relator as a member of the House of Representatives. The difference, which would be determined by mathematical computation prorating the salary of the legislator, should have been paid by the auditor to him.

When writs of mandate in the circuit and superior courts of this state were abolished, the causes of action theretofore remedied by writs of mandate were remedied by means of a complaint and summons, "as other civil actions." By Chapter 223 of the 1911 Acts, the relator was not required to demand in his complaint the exact amount due under the law and facts, and the relator was entitled "to such relief as the facts and

law grant." *State, ex rel.* v. *Board of Finance, etc.* (1914), 181 Ind. 365, 373, 104 N. E. 756. Section 4 of said Act (§ 3-2204, Burns' 1946 Replacement) makes this construction imperative by providing, ". . . if the finding and judgments be for the plaintiff, the court shall grant and adjudge to the plaintiff such relief, and such only, as he may be entitled to under the law and facts in such action, together with damages as in actions for false returns, and costs shall be awarded as the court may direct." The dictum to the contrary in *State, ex rel.* v. *Foland, Auditor* (1921), 191 Ind. 342, 132 N. E. 674, is based upon cases which were superseded by *State, ex rel.* v. *Board of Finance, etc., supra,* and totally ignores the plain provision of the statute, which established in Indiana the rule generally held that "the fact that the application or petition for mandamus prays for more relief than it shows the petitioner is entitled to is not a fatal defect and does not preclude the granting of the relief to which the relator is entitled under the facts stated, and established by evidence, although it is of course essential that the relief granted, whatever it may be, is within the prayer for relief. . . ." 38 C. J. 882, § 597.

The judgments of the trial court should have been reversed.

NOTE.—Reported in 81 N. E. 2d 850.