ATTORNEYS FOR APPELLANT
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Heather L. Hagan
Ashley Tatman Harwel
Deputy Attorney Generals
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
James A. Masters
South Bend, Indiana

Elizabeth Hardtke
South Bend, Indiana



FILED

Jun 29 2011, 10:28 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 71S00-1002-JV-156

IN THE MATTER OF:

A.B.,

*Appellant (Respondent below),*

v.

STATE OF INDIANA,

*Appellee (Petitioner below).*

Appeal from the St. Joseph County Probate Court, No. 71J01-0811-JD-000826
The Honorable Peter Nemeth, Judge

On Direct Appeal

**June 29, 2011**

**David, Justice.**

This is a direct appeal of an Order of Modification from the St. Joseph County Probate Court declaring three statutes—Indiana Code sections 31-37-17-1.4, 31-37-18-9(a)-(b), and 31-

40-1-2(f)—unconstitutional as violating the separation of powers principle under Article 3, Section 1 of the Indiana Constitution and the "one subject" rule under Article 4, Section 19.

We reverse the trial court's order and hold that the three statutes are constitutional. We further hold that the Department of Child Services (DCS) requirement that the child be placed in Indiana rather than being placed out of state at Canyon State Academy was arbitrary and capricious, and we uphold Judge Nemeth's placement of the child at Canyon State Academy. Finally, we hold that DCS shall pay for the placement of the child at Canyon State Academy.

## Facts and Procedural History

The facts set forth are lengthy, but necessary for the opinion. The juvenile, A.B., was born on May 6, 1993. In November 2008, A.B. was apprehended by the South Bend Police Department and detained at the St. Joseph County Juvenile Justice Center (SJCJJC). Shortly thereafter, A.B. admitted to committing criminal mischief, a Class B misdemeanor. The juvenile court found A.B. to be a delinquent child and continued his detention at the SJCJJC. In February 2009, the juvenile court entered a dispositional order and the child was placed on strict and indefinite probation at the Madison Center Residential Facility at the SJCJJC. In November 2009, the juvenile court found that A.B. had fled from his placement and issued an order of apprehension. The following month, A.B. was apprehended and placed in secure detention. In January 2010, the juvenile court ordered that A.B. remain detained at the SJCJJC.

On February 2, 2010, the St. Joseph Probate Court conducted a hearing on the placement of A.B. The hearing was attended by A.B., his counsel Elizabeth Hardtke, his mother A.M., his custodian S.K., his probation officer Anita Wigfall, and Dr. William Bruinsma.[1] Despite receiving notice, no DCS representative was present at this hearing.

Pursuant to statute, the probation department attended the hearing with a placement recommendation. It recommended that A.B. complete the Rite of Passage Program at Canyon State Academy in Arizona (ROP). DCS did not respond to the probation department's recommendations until February 1, 2010, and the probation department did not receive DCS's

---

[1] The record did not state who Mr. Bruinsma is; however, a brief internet search finds Mr. Bruinsma to be the director of the St. Joseph Juvenile Justice Center.

2

alternate recommendations until just before the February 2 court hearing. Thus, there was no opportunity for discussion of DCS's recommendations prior to the hearing.

The probation department noted several factors for its recommendation. The probation department indicated that A.B. was struggling in his placement at SJCJJC and was dealing with many issues, including new therapists and other staff turnovers. The probation department sought placement at ROP so that A.B. could learn vocational skills, complete his education, learn independent living skills, and transition to obtaining employment and exploring secondary education opportunities. The probation department reported that A.B. would not return to his mother and would take independent living classes. In making its recommendation, the probation department noted that although A.B.'s custodian had participated in his treatment, A.B.'s mother had not been participating. The probation department also stated that it did not have the current address information for the mother. The probation department further noted that after A.B. completed ROP, A.B. would transition to independent living, and that his participation in family therapy would be unnecessary. Nevertheless, A.B.'s family could participate in video conferencing, and ROP would fly the family to Arizona at no cost to the family.

The record from the trial court reveals that the average stay at ROP is twelve months. The per diem for ROP is $171.70, which includes $20 per day for transition from restrictive placement. The per diem also includes a warranty period during which they provide aftercare services. ROP provides individual therapy twice a month, family therapy twice a month via videoconferencing, aftercare family therapy twice a month, and aftercare individual therapy twice a month. ROP pays for four parent/guardian flights and lodging every twelve months. Additionally, the school is accredited by the Arizona Department of Education and by the North Central Association Commission on Schools, and the child attends school on-site, year round, and receives 242 days of instruction. All students are given a full assessment and have an individualized, prescriptive treatment plan to help their specific needs. ROP offers several vocational programs and Arizona Interscholastic Association sanctioned varsity, junior varsity, and club sports. As of 2008, ROP had an 88% success rate.

Although DCS did not appear at the hearing, and was not required to appear, it submitted alternate placement options for A.B. in Indiana: Christian Haven, Midwest Center for Youth and Families, White's Residential and Family Services, and Youth Opportunity Center.

The average stay at Christian Haven is between nine and fifteen months. Christian Haven has a per diem of $190.55, which does not include costs for transition from restrictive placement. Any warranty at Christian Haven is provided on a case-by-case basis. No aftercare is provided. Christian Haven provides a minimum of one hour of therapy per week and family therapy once per month, but does not offer video conferencing. Christian Haven allows visitation on Saturdays or Sundays from 1 p.m. to 5 p.m., but visitors are responsible for expenses of the visit. Christian Haven provides an on-ground, fully accredited public school, as well as educational opportunities in the Kankakee Valley School System. Christian Haven offers vocational programs and physical education classes along with some club sports.

Midwest Center for Youth and Families (Midwest) has an average stay of four to five months. Midwest has a per diem of $361 and offers no warranty. Midwest provides individual therapy and family therapy once per week and daily group therapy. Visitation is allowed on weekends from 2 p.m. to 5 p.m., and transportation assistance is assessed on a case-by-case basis. Midwest has an on-site, accredited school. Daily recreation is provided, but no vocational programs are offered. Midwest has a success rate of 85%.

White's Residential and Family Services (White's) has an average stay of ten to fourteen months. The per diem is $162.50 for the Open Residential Program and $196.50 per day for Intensive Substance Abuse Program and does not include the cost of aftercare. A warranty may be considered. Individual, family, and group counseling is provided as needed. Visitation occurs on the third weekend of every month. Also, financial assistance is available. White's has an accredited public high school and GED program. Vocational skills are taught, and athletics are offered.

Youth Opportunity Center (YOC) has an average stay of six to nine months. The per diem at YOC is $199.00. No warranty is offered. Aftercare is provided on site if appropriate. Individual therapy and family therapy are offered once per week, but is only offered on site. Visitation is offered two times per week. YOC provides an on-site school. YOC offers support

4

groups and programs on an as needed basis. YOC offers some vocational skills programs and requires everyone to participate in daily recreation.

Testimony at the hearing was that although both the family and the child would prefer to stay closer, they supported the move to ROP. DCS submitted that the four Indiana facilities are comparable to ROP and can address the same issues as ROP. DCS believed the extreme distance to ROP would hinder A.B.'s reunification with his family. Although Arizona and Indiana are separated by a great distance, a cursory review of the record reveals that reunification was not the goal for the probation department, but rather that A.B., who turns eighteen in May 2011, would learn to live independently. Furthermore, a review of the record reveals that the distance from ROP to Indiana may be beneficial: a new start in a new place may be the best scenario for A.B., who has a history of fleeing from previous placements.

The trial court entered its Order of Modification on February 8, 2010. In his order, Judge Nemeth found that Indiana Code sections 31-37-17-1.4,[2] 31-37-18-9(a)[3] and (b),[4] and 31-40-1-

[2] Indiana Code section 31-37-17-1.4 (2008) states as follows:
    (a) If the predispositional report includes a recommended placement, program, or services that would be payable by the department under IC 31-40-1-2, a probation officer shall refer the officer's completed predispositional report, except for the statement required under section 1(a)(4) of this chapter, to the department within a reasonable time before its required disclosure under section 6 of this chapter to allow the department time to:
        (1) review; and
        (2) either concur with or offer an alternative proposal to the recommendations in the predispositional report.
    (b) The department shall, after review of the predispositional report and any attachments necessary to verify the predispositional report, and within a reasonable time before the dispositional hearing, either:
        (1) concur with the predispositional report; or
        (2) communicate to the probation officer an alternative proposal regarding programs and services.
[3] Indiana Code section 31-37-18-9(a) (2010 Supp.) states as follows:
    The juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record concerning approval, modification, or rejection of the dispositional recommendations submitted in the predispositional report, including the following specific findings:
        (1) The needs of the child for care, treatment, rehabilitation, or placement.
        (2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.
        (3) Efforts made, if the child is removed from the child's parent, guardian, or custodian, to:
            (A) prevent the child's removal from; or
            (B) reunite the child with; the child's parent, guardian, or custodian.
        (4) Family services that were offered and provided to:
            (A) the child; or

5

2(f),[5] violate the separation of powers between the executive and administrative branch and the courts, and are unconstitutional infringements on the judicial power and authority of a juvenile court to make decisions concerning the out-of-state placement of children under the jurisdiction of the court. Judge Nemeth further found Indiana Code section 31-40-1-2(f) unconstitutional under Article 4, Section 19 of the Indiana Constitution, which limits legislative acts to one subject.

## Jurisdiction

The Department of Child Services has appealed this matter under Indiana Rule of Appellate Procedure 4(A)(1)(b), which states that this Court shall have mandatory and exclusive jurisdiction over "appeals of Final Judgments declaring a state or federal statute unconstitutional in whole or in part." The order being appealed is a final judgment declaring several state statutory provisions unconstitutional.

A.B. contends this matter was improperly appealed under Indiana Appellate Rule 4(A)(1)(b), and the only proper appeal was under Indiana Appellate Rule 14.1. Rule 14.1 is titled, "Expedited Appeal for Payment of Placement and/or Services" and governs "I.C. § 31-34-4-7(f), I.C. § 31-34-19-6.1(f), I.C. § 31-37-5-8(g), and I.C. § 31-37-18-9(d)." It provides that "all other appeals concerning children alleged to be in need of service or children alleged to be delinquent are not covered by this rule." Ind. Appellate Rule 14.1(A). Indiana Code sections 31-34-4-7(f) and 31-34-19-6(f) apply only in situations where a child is a child in need of services,

---

(B) the child's parent, guardian, or custodian.
    (5) The court's reasons for the disposition.
[4] Indiana Code section 31-37-18-9(b) (2010 Supp.) states as follows:

> If the department does not concur with the probation officer's recommendations in the predispositional report and the juvenile court does not follow the department's alternative recommendations, the juvenile court shall:
>     (1) accompany the court's dispositional decree with written findings that the department's recommendations contained in the predispositional report are:
>         (A) unreasonable based on the facts and circumstances of the case; or
>         (B) contrary to the welfare and best interests of the child; and
>     (2) incorporate all documents referenced in the report submitted to the probation officer or to the court by the department into the order so that the documents are part of the record for any appeal the department may pursue under subsection (d).

[5] Indiana Code section 31-40-1-2(f) (2010 Supp.) states as follows:

> The department is not responsible for payment of any costs or expenses for housing or services provided to or for the benefit of a child placed by a juvenile court in a home or facility located outside Indiana, if the placement is not recommended or approved by the director of the department or the director's designee.

not a delinquent child like A.B., thus they are not applicable to A.B.'s jurisdictional argument. Indiana Code section 31-37-5-8(g) applies only to services and programs provided prior to an entry of a dispositional decree; thus, it too falls outside the scope of A.B.'s jurisdictional claim. That leaves Indiana Code section 31-37-18-9(d), which states that "if the juvenile court enters findings and a decree under subsection (b), the department may appeal the juvenile court's decree under any available procedure provided by the Indiana Rules of Trial Procedure or Indiana Rules of Appellate Procedure to allow any disputes arising under this section to be decided in an expeditious manner." Ind. Code § 31-37-18-9(d) (2010 Supp.). Thus, the only statute applicable to A.B. under Rule 14.1, Indiana Code section 31-37-18-9(d), states the department may appeal the juvenile court's decree under any available procedure provided by the Indiana Rules of Appellate Procedure. Therefore, DCS may appeal under Appellate Rule 4(A)(1)(b).

## I. Single Subject Clause

We first address the trial court's ruling that Indiana Code section 31-40-1-2(f) is unconstitutional under Article 4, Section 19 of the Indiana Constitution, which limits legislative acts to "one subject." Article 4, Section 19 states, "An act, except an act for the codification, revision or rearrangement of laws, shall be confined to one subject and matters properly connected therewith."

The 2009 First Special Session of the 116th General Assembly passed P.L. 182-2009, "An Act to amend the Indiana Code concerning State and local administration and to make an appropriation," which amended Indiana Code section 31-40-1-2(f) to its present reading. Indiana Code section 31-40-1-2(f) relates to the state budget and reads,

> The department is not responsible for payment of any costs or expenses for housing or services provided to or for the benefit of a child placed by a juvenile court in a home or facility located outside Indiana, if the placement is not recommended or approved by the director of the department or the director's designee.

Ind. Code § 31-40-1-2(f) (2010 Supp.)

7

Public Law 182-2009ss, Sec. 387 added "is not recommended or approved by the director of the department or the director's designee," replacing the previous language, "does not comply with the conditions stated in I.C. § 31-34-20-1(b) or I.C. § 31-37-19-3(b)."

The amendment to Indiana Code section 31-40-1-2(f) addresses appropriations, namely, whether DCS is financially responsible for the placement of a juvenile. This amendment relates to the other items in the bill. The amendment to Indiana Code section 31-40-1-2(f) relates to appropriations and the state budget and does not violate Article 4, Section 19 of the Indiana Constitution limiting acts to one subject.

## II. Separation of Powers

We next determine if the three statutes violate Article 3, Section 1 of the Indiana Constitution. Article 3, Section 1 of the Indiana Constitution, commonly known as the "separation of powers" provision, states, "The powers of the Government are divided into three separate departments; the Legislative, the Executive, including the Administrative, and the Judicial: and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." Ind. Const. art. 3, § 1.

A.B. argues the challenged statutes allow the director of DCS to supplant the juvenile court judge in making dispositional decrees affecting children under his jurisdiction. DCS responds that the challenged statutes did not take away power from the juvenile court judges and further argues that these statutes are not about child placement, but about who will *pay* for a child's placement.[6] We believe these statutes do not violate the separation of powers provision of the Indiana Constitution. The statutes still provide an avenue for judicial review of placement and do not usurp the powers of the trial court or the judiciary, and they do not impermissibly shift those powers to the executive branch.

We first determine whether the law has the effect of a coercive influence on the perceived usurped branch of government. The purpose of the separation of powers provision is to rid each

---

[6] Neither party challenges Indiana Code section 31-40-1-2(h), under which provisions DCS may attempt to seek payment from a county for the failure of a juvenile court's dispositional order or a probation officer's predispositional report to fulfill the language requirements specified in Indiana Code sections 31-40-1-2(d) and (g).

separate department of government from any influence or control by the other department. State ex rel. Black v. Burch, 226 Ind. 445, 463, 80 N.E.2d 294, 302 (1948). Upon review, the statutes in question do not allow DCS to control the duties of the judiciary. Instead, they determine assistance for payment of a juvenile placement and costs associated with rehabilitating children. In other words, the statutes in question do not limit a judge's power to place a child where the judge determines is in the child's best interest. Rather, the statutes deal with how the state, through DCS, funds each child's placement. As our Court of Appeals correctly wrote,

> Each department of government possesses a legitimate, exclusive sphere of influence, and if any department "fails to perform its duty[,] the remedy is not to be found in the attempt of some other department to perform such duties. . . . Such attempt would be usurpation, more dangerous to free government than the evil sought to be corrected."

Logansport State Hosp. v. W.S., 655 N.E.2d 588, 590 (Ind. Ct. App. 1995) (quoting Hovey, Governor v. State ex rel. Shuck, 127 Ind. 588, 599, 27 N.E. 175, 178 (1891)).

However, we are mindful that "[i]f the separation of powers is to be maintained, it is essential that the judicial branch [of] government not be throttled by either the legislative or administrative branches, and that the courts be empowered to mandate what is reasonably necessary to discharge their duties." McAfee v. State ex rel. Stodola, 258 Ind. 677, 681, 284 N.E.2d 778, 782 (1972). Webster's defines "throttle" as "to choke or strangle." Webster's II New College Dictionary 1150 (2nd ed. 1995). Although this law does not throttle the judiciary by way of the administrative branch, it comes dangerously close to stifling the inherent empowerment our juvenile courts have always enjoyed in making decisions in the best interest of juveniles.

It is acceptable that the legislature has established a process for the state to pay for placement and a process for the county to be ultimately responsible. However, justice demands that consideration be given not only to which entity is going to pay, but what the costs and per diem are for the various placement options, as well as all other relevant and pertinent factors focused on the best interest of the child. As the Court of Appeals eloquently wrote, "It is not within the scope of the powers granted to the executive branch of government that it should sit as a superjudiciary to decide which laws and judicial determinations it will obey and which it will

9

not." State ex rel. Mass Transp. Auth. of Greater Indianapolis v. Ind. Revenue Bd., 144 Ind. App. 63, 96, 253 N.E.2d 725, 736 (1969). To the extent that DCS can veto a juvenile court's out of state placement determination by withholding funds, DCS is moving very close to usurping the judiciary's authority when it comes to dealing with the lives of children.

Indiana Code section 31-37-18-9(a) and (b) do not violate the separation of powers provision of Article 3, Section 1 of the Indiana Constitution. Indiana Code section 31-37-18-9(a) begins with the statement "the juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record *concerning approval, modification, or rejection* of the dispositional recommendations submitted in the predispositional report . . . ." Ind. Code § 31-37-18-9(a) (2010 Supp.) (emphasis added). The legislature is not mandating that the judiciary concur with the predispositional report filed by DCS from the executive branch. Subsection (a) delineates specific findings for the juvenile court to make in its dispositional decree. However, the legislature is not directing the judiciary what to find. There is no usurpation of judicial power in subsection (a).

Further, we find Indiana Code section 31-37-18-9(b) does not violate the separation of powers provision of Article 3, Section 1. Subsection (b) outlines the procedure taken if the juvenile court does not concur with the department. It directs the juvenile court to make written findings if it disagrees with DCS and to preserve a complete record should DCS choose to appeal. Here, the legislature has not usurped the power of the juvenile court. In fact, the legislature has established a mechanism to address the scenario when the juvenile court disagrees with DCS. Facially, there is not a violation of separation of powers. In sum, Indiana Code section 31-37-18-9 allows each department to operate in its sphere of influence. It allows the executive branch, through its administrative agency, DCS, to propose to the juvenile court placement recommendations for a child. It also allows a juvenile court to disagree with the recommendations of DCS and provides the mechanism for that disagreement, and an ability for DCS to appeal the juvenile court's contrary decision.

Indiana Code section 31-37-17-1.4 does not violate the separation of powers provision of Article 3, Section 1 of the Indiana Constitution. It outlines the procedure DCS and the probation officer undertake when preparing a recommendation for the juvenile court. If the probation

10

officer makes a recommendation on placement, programs, or services that would be payable by DCS under Indiana Code section 31-40-1-2, the probation officer must allow DCS time to review and either concur with the recommendations in the predispositional report or offer an alternative proposal to the recommendations. The department then shall either concur with the predispositional report from the probation officer or communicate with the probation officer an alternative proposal regarding programs and services.

None of the language of Indiana Code section 31-37-17-1.4 usurps the power of the judiciary or promotes interference by one branch of government with another branch of government. Indiana Code section 31-37-17-1.4 describes tasks and duties of DCS and the probation officers in preparing various proposals and recommendations in a predispositional report. The statute is silent on the ultimate decision as to placement. Ultimately, the juvenile court judge makes the final decision either agreeing or disagreeing with recommendations found in the predispositional report. In sum, Indiana Code section 31-37-17-1.4 does not usurp the power of the juvenile court judge to ultimately make the decisions in his or her courtroom.

Indiana Code section 31-40-1-2(f) does not violate the separation of powers provision of Article 3, Section 1 of the Indiana Constitution. The statute in question states, "The department is not responsible for payment of any costs or expenses for housing or services provided to or for the benefit of a child placed by a juvenile court in a home or facility located outside Indiana, if the placement is not recommended or approved by the director of the department or the director's designee." Ind. Code § 31-40-1-2(f). This provision does not prevent the juvenile court from placing a child outside the state of Indiana. First and foremost, the director of DCS or the director's designee could approve placement outside the state and thus be responsible for the payment. In the alternative, a juvenile court judge could pay for the placement from the county's funds or could order the parents or guardians of the child to pay for the placement outside Indiana.

Ultimately, we conclude that these statutes do not violate the "separation of powers" provision of the Indiana Constitution. The juvenile court judge still has and shall continue to have the final authority in making decisions for the juveniles.

11

### III. Arbitrary and Capricious

Having determined that the laws as applied are constitutional, we turn to the placement decision by the juvenile court and action by DCS in overruling that placement decision. In 2008, the General Assembly specified in Indiana Code section 31-40-1-2(f) that DCS was not responsible for the cost of out-of-state placements or services unless the juvenile court made certain written findings "based on clear and convincing evidence" that there was not a "comparable facility with adequate services" in Indiana or that the placement was within fifty miles of the child's residence. As discussed above, the 2009 amendment to Indiana Code section 31-40-1-2(f) changed this specification to provide that DCS is not responsible for the cost of out-of-state placement or services unless the placement is recommended or approved by DCS's Director or the Director's designee.

The 2009 amendment to section 31-40-1-2(f) applies only to out-of-state placements. DCS argues that the 2009 amendment gives it absolute "control over when the State will pay for out-of-state placements;" that is, the Director's decisions are not subject to the expedited appellate review procedures implemented by Appellate Rule 14.1. We agree with DCS that the effect of the 2009 amendment is to remove from the expedited appellate review procedures adopted in 2008 those out-of-state placements and services that the DCS Director does not recommend or approve. The language of those provisions authorizes appeals from court decisions with which DCS does not concur. It would not be logical to apply those provisions to decisions made, not by the court, but by DCS itself. For similar reasons, we think that a disapproving decision by the DCS Director cannot be overruled by the juvenile court at which it is directed. But we cannot agree that the new provision is immune from any judicial review whatsoever.

It is well established that Article 7 section 4 of the Indiana Constitution confers plenary appellate jurisdiction on this Court. Troue v. Marker, 253 Ind. 284, 288, 252 N.E.2d 800, 803 (1969). ("The action of this Court is based upon its inherent constitutional duty to act as the final and ultimate authority in stating what the law in this state is."); cf. Durousseau v. United States, 10 U.S. 307, 6 Cranch 307, 314, 3 L. Ed. 232 (1810) (opinion for the Court by Marshall, C.J.)

12

(Finding that the "appellate powers of this court" are not created by statute but are "given by the constitution").

Given that the General Assembly apparently intended that the DCS Director have the authority to override the determination of a juvenile court with respect to the costs of out-of-state placements and services, what standard of appellate review is appropriate? Without the legislature providing "any procedural machinery for an appeal or review," Warren v. Indiana Telephone Co., 217 Ind. 93, 108, 26 N.E.2d 399, 405 (1940), how should we proceed to assure that our review of the DCS Director's decision here is guided by principled and clear standards? After all, "[u]niformity in the interpretation and application of the law is the keystone of our system of jurisprudence." Id.

One possible approach would be to follow the methodology adopted for appellate review under Appellate Rule 14.1.

We begin with a CHINS action, In re T.S., 906 N.E.2d 801 (Ind. 2009), to examine this present issue. T.S. was our first foray into Indiana Appellate Rule 14.1 and the review of juvenile court decisions about placement recommendations made by DCS. DCS requested the child T.S. be reunited with his parents, but the juvenile court decided it would be contrary to T.S.'s best interests to follow the DCS recommendation, and T.S. remained in foster care until the end of the school year. Id. at 802. DCS appealed that decision pursuant to Appellate Rule 14.1. Id. DCS challenged the court's placement order, contending that its recommendations had been neither unreasonable based on the facts and circumstances of the case, nor contrary to the welfare or best interests of the child. Id.

T.S. considered the proper standard of review of an expedited appeal, and found that it was specifically delineated by Indiana Code section 31-34-19-6.1(d): "The juvenile court shall accept each final recommendation of [DCS] . . . unless the juvenile court finds that a recommendation is: (1) unreasonable, based on the facts and circumstances of the case; or (2) contrary to the welfare and best interests of the child." T.S. at 803. Indiana Code section 31-34-19-6.1(d) and the statute covering delinquency cases, Indiana Code section 31-37-18-9(b), are similar. Pursuant to Indiana Code section 31-37-18-9(b), if the juvenile court does not follow the department's recommendations, the juvenile court shall "accompany the court's dispositional

13

decree with written findings that the department's recommendations contained in the predispositional report are: (1) unreasonable, based on the facts and circumstances of the case; or (2) contrary to the welfare and best interests of the child." The standard in both delinquency and CHINS cases is the same. Ind. Code § 31-37-18-9(b). As stated in T.S., the statute creates a "presumption of correctness" for DCS, meaning any contrary disposition by the juvenile court must be supported by a preponderance of the evidence. In re T.S., 906 N.E.2d at 804. After the juvenile court has considered the DCS recommendations and reached a contrary conclusion, Indiana Trial Rule 52 governs: "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Id. (citing Ind. T.R. 52(A)).

Although we continue to adhere to this standard of review for appeals brought under Appellate Rule 14.1, we believe it gives insufficient deference to disapproving decisions made by the DCS Director under Indiana Code section 31-40-1-2(f). The 2009 amendment gave the DCS Director the authority to override juvenile court determinations that previously were required to be based on clear and convincing evidence. It would be contrary to legislative intent, we believe, for an appellate court to overturn a DCS Director's disapproving decision based only on a conclusion that the juvenile court's determination was not clearly erroneous.

Rather than review a DCS Director's disapproving decision using the clearly erroneous standard of Appellate Rule 14.1, we believe the appropriate standard is provided by Indiana's Administrative Orders and Procedures Act (AOPA), Indiana Code section 4-25.1. While we recognize that the General Assembly has not directed that disapproving decisions made by the DCS Director under Indiana Code section 31-40-1-2(f) are subject to AOPA, AOPA does in fact provide that "[t]his article creates minimum procedural rights and imposes minimum procedural duties." Ind. Code § 4-21.5-2-1 (1986). "This article applies to an agency, except to the extent that a statute clearly and specifically provides otherwise." Id. § 4-21.5-2-3. None of the questioned statutes provide that DCS is not subject to judicial review under the Indiana Administrative Orders and Procedures Act.

We note that Indiana Code section 4-21.5-2-6 states, "This article does not apply to the formulation, issuance, or administrative review (but does apply to the judicial review and civil

14

enforcement) of any of the following: (1) except as provided in I.C. 12-17.2-4-18.7 and I.C. 12-17.2-5-18.7, determinations by the division of family resources and the department of child services." Ind. Code § 4-21.5-2-6. The statute states clearly that the article applies to judicial review of DCS determinations. This is consistent with our common law. The director's designee had the discretion to approve the out-of-state placement. Ind. Code § 31-40-1-2(f).

We do not believe it is necessary to hold that disapproving decisions made by the DCS Director under Indiana Code section 31-40-1-2(f) are subject to AOPA. It is enough that we will apply its standards in appellate review of those decisions. AOPA specifies five instances under which judicial relief should be granted due to prejudice by an agency action: if the agency action is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Ind. Code 4-21.5-5-14(d) (2009); see also Ripley County Bd. Zoning Appeals v. Rumpke of Ind., Inc., 663 N.E.2d 198, 203 (Ind. Ct. App. 1996), trans. denied. An arbitrary and capricious decision is one which is "patently unreasonable" and is "made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion." City of Indianapolis v. Woods, 703 N.E.2d 1087, 1091 (Ind. Ct. App. 1998). In reviewing the actions of DCS in making placement recommendations that are not in agreement with the trial court, we will review the DCS action to determine if it was in conformity with Indiana Code section 4-21.5-5-14.

This Court has previously held that the judicial branch of government may only interfere with acts of the administrative branch whenever a judicial question is involved, as in arbitrary or capricious action by an administrative body. Pub. Serv. Comm'n v. Ind. Bell Tel. Co., 232 Ind. 332, 347, 112 N.E.2d 751, 753 (1953). As this Court held as early as 1935, an arbitrary or capricious decision by an administrative body would call for judicial action, even if there is no statute authorizing an appeal. Peden v. Bd. of Review of Cass County, 208 Ind. 215, 224, 195 N.E. 87, 90 (1935).

Justice Shake wrote on these issues in this Court's decision in <u>Warren v. Ind. Telephone Co.</u>, 217 Ind. 93, 26 N.E.2d 399 (1940), a workmen's compensation action that brought to light questions of when the judiciary continues to have control over an administrative agency. His words then are still relevant today, "The matters presented challenge us to consider some very serious and important questions, among which may be mentioned, the place of the Supreme Court in the judicial system of the state; the power of the General Assembly with respect to administrative agencies. . . ." <u>Warren</u>, 217 Ind. 93, 100–101, 26 N.E.2d 399, 402 (1940). This Court wrote that an administrative agency is properly vested with power to determine facts and exercise their power under due process of law. <u>Id.</u> at 104, 26 N.E.2d at 404. "It is not necessary to the exercise of due process that the facts be determined by a court, so long as there is provided or exists an opportunity for a judicial review." <u>Id.</u> The words of this Court then are prescient now:

> [O]rders of an administrative body are subject to judicial review and . . . they must be so to meet the requirements of due process. Such review is necessary to the end that there may be an adjudication by a court of competent jurisdiction that the agency has acted within the scope of its powers; that substantial evidence supports the factual conclusions; and that its determination comports with the law applicable to the facts found.

<u>Id.</u> at 105, 26 N.E.2d at 404.

> If, however, it should be made to appear that the evidence upon which the agency acted was devoid of probative value; that the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; or that the result of the hearing must have been substantially influenced by improper considerations, the order will be set aside, not because incompetent evidence was admitted, but rather because the proof, taken as a whole, does not support the conclusion reached.

<u>Id.</u> at 118, 26 N.E.2d at 409.

We also find an apt analogy with the case of <u>State ex rel. Smitherman v. Davis</u>, 238 Ind. 563, 151 N.E.2d 495 (1958). In this action, the Superintendent of Schools twice denied the request for children to transfer schools to a different school in the district. <u>Id.</u> at 566, 151 N.E.2d at 496. Transfer of pupils was discretionary with the school officials. <u>Id.</u> at 568, 151 N.E.2d at 497. This Court found that the refusal to grant transfer to pupils, although discretionary, was still subject to judicial review. <u>Id.</u> at 569, 151 N.E.2d at 497. This Court cited <u>Warren</u>, *supra*, that it

is well settled law that a decision of an administrative officer is not final in Indiana. Id. at 569, 151 N.E.2d at 497. This Court held that the law is well settled "that all discretionary acts of public officials, which directly and substantially affect the lives and property of the public, are subject to judicial review where the action of such official is . . . arbitrary or capricious . . ." Id. at 569, 151 N.E.2d at 498. The power that is vested in the public officer in making discretionary determinations is not for his benefit, but for the benefit of the public. Id. at 570, 151 N.E.2d at 498.

Similar to the Superintendent in Smitherman, the actions of the DCS director or his agent in recommending or approving the probation department's recommendation for placement is discretionary. The word "discretionary" is defined by Black's Law Dictionary as "(of an act or duty) involving an exercise of judgment and choice, not an implementation of a hard-and-fast rule." Black's Law Dictionary, 534 (9th ed. 2009). We find the statutes relating to juvenile delinquency placement void of any hard-and-fast rule that does not allow for out-of-state placement. Furthermore, as in Smitherman, we hold that the power of recommending or approving the probation department's recommendation for placement shall be done not for the benefit of DCS, but for the benefit of the child. Such recommendation shall be subject to judicial review where the recommendation of DCS is arbitrary or capricious.

Under Indiana Code section 31-40-1-2(a), DCS pays the cost of any child services provided by or through the department for any child or the child's parent, guardian, or custodian. In this case, the DCS Director did not approve the placement, triggering subsection (f)'s provision that

> "[t]he department is not responsible for payment of any costs or expenses for housing or services provided to or for the benefit of a child placed by a juvenile court in a home or facility located outside Indiana, if the placement is not recommended or approved by the director of the department or the director's designee."

Ind. Code § 31-40-1-2(f).

Despite the fact that DCS did not recommend or approve the out-of-state ROP facility, the juvenile court ordered, "The St. Joseph County Department of Child Services, as administrator of the Family and Children's Fund, shall pay for said placement."

17

In reaching this conclusion, the juvenile court followed protocol under Indiana Code section 31-37-18-9 in making findings that the recommendation in the predispositional report was "(1) unreasonable, based on the facts and circumstances of the case; or (2) contrary to the welfare and best interests of the child." Ind. Code § 31-37-18-9. In making those findings, the juvenile court found that the per diem charge for ROP is $171.70, with a warranty period of one-third of the placement provided and aftercare provided at no additional cost. The court found that the next closest program in price was Christian Haven at $190.55, with warranty determined on a case-by-case basis and no aftercare provided. Other programs cost $196.50 per diem, $199 per diem, and $361 per diem. None of the other programs guarantee a warranty period, nor include aftercare. An aftercare program and a warranty period would logically seem to be in the best interest of the child. The juvenile court further made findings that the child, the child's parent, the child's custodian, the child's probation officer, and the child's attorney all agreed with placement at ROP was in the best interest of the child. The juvenile court found that ROP offered a high quality of treatment, which matched the needs of the child, had a residential treatment program for males with conduct disorders, and had a success rate of 88% in 2008 and a 79% success rate over the past 5 years, better than the success rate of the DCS recommended placements. Thus, the trial court found the out of state placement was superior to the in state options for the reasons stated in the record.

In this particular fact scenario, the agency action in denying out of state placement was arbitrary and capricious. The placement at ROP is more cost effective than any placement option in Indiana, and ROP was offering a scholarship to help defray the costs. The per diem for ROP is $171.70, while placement at Christian Haven is $190.55, Midwest is $189.30, White's is either $162.50 or $196.50 depending on the type of placement, and the cost of YOC is $199.00. Furthermore, the per diem of ROP included costs of transition out of the restrictive placement and costs of aftercare services, while none of the other placements either provided or could guarantee those same services would be provided. The only rationale for DCS opposing the recommendations appears to be based on the decision to keep A.B. in Indiana. While a significant factor, this was not deemed critical to the plan for A.B. by the juvenile probation officers. Instead, the juvenile probation officer believed placement out of state would help A.B. as he had absconded from previous placements in Indiana and independent living was the likely best outcome for A.B. now that he was approaching 18 years of age. Furthermore, for the

18

members of A.B.'s family who want to maintain a relationship with A.B., ROP offers video conferencing and even airplane flights and hotel rooms for family to visit ROP. ROP also allows for A.B. to learn vocational skills, complete his education, learn independent living skills, and transition to obtaining employment, and explore secondary education opportunities. From our review of the record, ROP could provide for all of these needs of A.B. better than the other recommendations. The probation department reported that the child was not going to return to his mother and that he would take independent living classes. In making its recommendation, the probation department noted that although A.B.'s custodian had participated in his treatment, A.B.'s mother had not been participating. A.B. was an older teenager whose future plan included independent living, not reunification. In fact, it was arguably better for A.B. to get out of his home surroundings, which resulted in him fleeing previous placements.

The crux of the matter is the final phrase of Indiana Code section 31-40-1-2(f), "if the placement is not recommended or approved by the director of the department or the director's designee." This recommendation or approval is subject to appellate review, as discussed previously. DCS's refusal to approve the ROP placement was unreasonable and contrary to the evidence in this case that would have lead the reasonable person to determine ROP was the best placement for A.B. It appears as if the overriding factor—perhaps the only factor considered by DCS in not approving ROP as a placement—was that it was in Arizona and not in Indiana. When combined with the fact that ROP is less expensive than the Indiana options, the *child and family's willingness to go to ROP*, and the fact that the plan is for independent living, the refusal to approve of ROP is arbitrary and capricious. DCS cannot be the final arbitrator of all placement decisions. Because we conclude that DCS's failure to approve ROP was arbitrary and capricious, we agree with the trial court's determination that DCS is responsible for the payment. DCS should have concurred with the decision to place A.B. at ROP. If DCS approved placement at ROP, they would have been responsible for payment. Ind. Code § 31-40-1-2(f). Because its decision to not approve ROP was arbitrary and capricious it is responsible for payment.

**Conclusion**

We conclude that Indiana Code section 31-37-17-1.4, Indiana Code section 31-37-18-9(a) and 9(b) as added by P.L. 146-2008, and Indiana Code section 31-40-1-2(f) as amended by P.L.

19

182-2009(ss), Sec. 387 are constitutional under Article 3, Section 1 of the Indiana Constitution. We further conclude that Indiana Code section 31-40-1-2(f) as amended by P.L. 182-2009ss, Sec. 387 is constitutional under Article 4, Section 19 of the Indiana Constitution. The child is ordered to continue in placement, if still in placement at ROP in Arizona. DCS is ordered to pay for said placement.

If DCS wants to disapprove and thereby not pay for out-of-state placement pursuant to statute, such decision is subject to appellate review, but only upon an arbitrary and capricious showing. While perhaps very infrequently, scenarios can exist where the better placement for a juvenile is outside of Indiana. Our focus should be on what is best for the juvenile in light of all circumstances of a particular case, including consideration of the costs of placement. DCS will continue to make placement recommendations and either concur or not with the judicial officers placement decisions. However, DCS may not make these determinations in a manner that is arbitrary and capricious. Any party may take an appeal to the Court of Appeals, which will review the decision under an arbitrary and capricious standard as discussed above. If the Court of Appeals determines DCS arbitrarily and capriciously refused to approve the judicial officer's placement decisions, DCS will be responsible for payment as if it would have approved the recommendation.

Shepard, C.J. and Rucker, J., concur.

Dickson, J., concurs with separate opinion.

Sullivan, J., concurs in part with separate opinion.

**Dickson, Justice, concurring.**

I concur with the Court's opinion and write separately to emphasize that the Court's *de novo* application of Indiana's Single-Subject Clause reflects the purposes and intentions of its framers and ratifiers not only in 1851 when initially crafted and ratified but also, and most importantly, when recently revised in 1974.

The current language of the Clause is the second refinement of the original Section 19 adopted as part of the Indiana Constitution in 1851. The original text stated:

> Every Act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.

To exclude legislative codifications, the provision was revised in 1960 to read as follows:

> Every act, amendatory act or amendment of a code shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, amendatory act or amendment of a code, which shall not be expressed in the title, such act, amendatory act or amendment of a code shall be void only as to so much thereof as shall not be expressed in the title. The requirements of this paragraph shall not apply to original enactments of codifications of laws.

But in 1974, Section 19 was amended to its present form by the General Assembly and Indiana's voters by eliminating the requirement that all subjects must be included in the title of a legislative act but expressly retaining and reasserting the single-subject prerequisite:

> An act, except an act for the codification, revision or rearrangement of laws, shall be confined to one subject and matters properly connected therewith.

Indiana is not alone in requiring legislative enactments to be confined to a single subject. Today, eighty-two percent of state constitutions (forty-one of the fifty) contain a general single-subject rule.[1]

---

[1] *See* ALA. CONST. art. IV, §§ 45, 71; ALASKA CONST. art. II, § 13; ARIZ. CONST. art. IV, § 13; CAL. CONST. art. IV, § 9; COLO. CONST. art. V, § 21; DEL. CONST. art. II, § 16; FLA. CONST. art. III, § 6; GA. CONST. art. III, § V; HAW. CONST. art. III, § 14; IDAHO CONST. art. III, § 16; ILL. CONST. art. IV, § 8;

The original proponent of the single-subject requirement at Indiana's Constitutional Convention of 1850–51was Dr. Alexander C. Stevenson, a delegate from Putnam County, who had served previously in the Indiana House of Representatives during 1831–32, in the Indiana Senate from 1839–42, and again in the House in 1844–45, when he served as Speaker of the House. During the Convention's discussion of various provisions on legislation, Stevenson proposed an amendment that included a single-subject requirement and explained:

> The object of this amendment is to obviate a difficulty that frequently occurs in the Legislature. When a bill is presented and its friends are not numerous enough to pass it, [] they enter into a coalition with gentlemen who desire the passage of some other measure to mutually assist each other in the passage of both combined under one head.

Report of the Debates and Proceedings of the Convention, vol. 2, at 1085 (reprinted by the Indiana Historical Bureau, 1935). Several delegates opposed the proposal because it would mean that the courts would decide whether a law embraces two or more objects. These opponents preferred this to be a matter exclusively for legislative determination. *See id.* at 1086. After substantial debate, Delegate Stevenson implored his fellow delegates, "Now, I have seen the power that a few individuals have in passing bills that are worthless and injurious, by tacking them upon other bills, even upon revenue bills. This is an evil which should be remedied. We are here to reform it—and ought to reform it." *Id.* at 2010. The Stevenson proposal was eventually adopted by a vote of 78 to 31. *Id.* at 2011. The proceedings at the Convention strongly suggest that the delegates expected Section 19 to be enforced in the courts, not entrusted to the legislature.

---

IND. CONST. art. 4, § 19; IOWA CONST. art. III, § 29; KAN. CONST. art. 2, § 16; KY. CONST. § 51; LA. CONST. art. III, § 15; MD. CONST. art. III, § 29; MICH. CONST. art. IV, § 24; MINN. CONST. art. IV, § 17; MO. CONST. art. III, § 23; MONT. CONST. art. V, § 11(3); NEB. CONST. art. III, § 14; NEV. CONST. art. IV, § 17; N.J. CONST. art. IV, § VII; N.M. CONST. art. IV, § 16; N.Y. CONST. art. III, § 15; N.D. CONST. art. IV, § 13; OHIO CONST. art. II, § 15(D); OKLA. CONST. art. V, § 57; OR. CONST. art. IV, § 20; PA. CONST. art. 3, § 3; S.C. CONST. art. III, § 17; S.D. CONST. art. III, § 21; TENN. CONST. art. II, § 17; TEX. CONST. art. III, § 35(a); UTAH CONST. art. VI, § 22; VA. CONST. art. IV, § 12; WASH. CONST. art. II, § 19; W. VA. CONST. art. VI, § 30; WIS. CONST. art. IV, § 18; WYO. CONST. art. III, § 24. The constitutions of Arkansas, Connecticut, Maine, Massachusetts, Mississippi, New Hampshire, North Carolina, Rhode Island, and Vermont lack a single-subject rule.

To explain the provisions of the proposed new constitution to the voters who would be deciding its ratification, the delegates at the Constitutional Convention approved an "Address to the Electors" that included the following explanation of the Single-Subject Clause:

> No law is to embrace more than one subject and matters properly connected therewith; . . . . The tendency of this rule is, to prevent what is familiarly termed "log-rolling." Two provisions having no proper connection with each other, may, under the present Constitution, be embraced in the same bill, and be carried by a combination of their respective friends, though neither, in itself, has merit or strength enough to obtain the vote of a majority, and would fail, as it ought, if voted upon singly.

*Id.* at 2047. In addition to the text of the Single-Subject Clause itself, this explanation, expressly adopted by the Convention, remains the most authoritative guide for our interpretation of the Clause.

Less than five years after the adoption of Indiana's Constitution in 1851, the Indiana Supreme Court, in an opinion authored by Judge Samuel E. Perkins, upheld as proper the role of the courts to enforce Section 19, noting that the Section "may be regarded as expressly requiring the Courts to do so." Ind. Cent. Ry. Co. v. Potts, 7 Ind. 681, 684 (1856). The Court declared that "[t]he constitution, then, in this case, imposes upon the Court the obligation of determining whether the section of the act upon which this suit was brought, is properly included in the act as entitled." *Id.* The year before, in Beebe v. State, 6 Ind. 501 (1855), the Court invalidated the Liquor Act of 1855 upon grounds other than a claimed violation of the Single-Subject Clause. The majority opinion here was also authored by Judge Perkins, but the dissent of Judge Samuel B. Gookins specifically addressed the single-subject issue, arguing that enforcement of the Clause would make legislation "wholly impracticable, and the laws passed under it a tissue of absurdities." *Id.* at 555. Neither Judge Perkins nor Judge Gookins had served as delegates to the Constitutional Convention, but one, Judge Gookins, had served in the state legislature prior to his service as a Supreme Court judge.

In cases decided shortly after the 1851 adoption of Indiana's Constitution, the Court was not hesitant to emphasize its responsibility to enforce the constitutional requirement:

3

> Our constitution provides that, parts of an act not embraced by the title, or properly connected therewith, shall be void. This provision is not directory merely to the legislature, but imposes a duty directly upon the Courts, after the legislature has acted, of determining what part, if any, of each legislative act is outside of its title or a proper connection with it. It is a duty, the discharge of which is often attended with great difficulty. It calls for a practical judgment of the Court upon each case, without much aid from any general definition or rule that can be enunciated.

Kuhns v. Krammis, 20 Ind. 490, 491 (1863). In application, however, the Court's decisions were often inconsistent. Beginning with the Civil War period, the Court appears to have been increasingly resistant to such claims and more deferential to the legislature's combination of subjects in the same legislation. *See, e.g.*, Hingle v. State, 24 Ind. 28 (1865); Bright v. McCullough, 27 Ind. 223 (1866); Bush v. City of Indianapolis, 120 Ind. 476, 22 N.E. 422 (1889); State v. Arnold, 140 Ind. 628, 38 N.E. 820 (1894); Baldwin v. State, 194 Ind. 303, 141 N.E. 343 (1923); Sarlls v. State ex rel. Trimble, 201 Ind. 88, 166 N.E. 270 (1929); State ex rel. Test v. Steinwedel, 203 Ind. 457, 180 N.E. 865 (1932); Stith Petroleum Co. v. Ind. Dept. of Audit & Control, 211 Ind. 400, 5 N.E.2d 517 (1937); Ennis v. State Highway Comm'n, 231 Ind. 311, 108 N.E.2d 687 (1952); Dague v. Piper Aircraft Corp., 275 Ind. 520, 418 N.E.2d 207 (1981); *but see* Jackson v. State ex rel. South Bend Motor Bus Co., 194 Ind. 248, 142 N.E. 423 (1924); State ex rel. Pearcy v. Criminal Court of Marion Cnty., 262 Ind. 9, 274 N.E.2d 519 (1971).

Significantly, however, in 1974 the Indiana General Assembly initiated and voters approved a revision of Section 19 that expressly reasserts the requirement that, except for legislation for the codification, revision, or rearrangement of laws, every act "shall be confined to one subject and matters properly connected therewith." IND. CONST. art. 4, § 19. This amendment was proposed by the legislature immediately following, and presumably precipitated by, this Court's opinion in Pearcy, which applied Section 19, as amended in 1960, to call into question the legislature's enactment of the Indiana Code of 1971, a purported codification of then-existing statutes.[2] Pearcy held that such "Code" did not fall within the exception provided

---

[2] The 1971 Indiana Code was the culmination of two years of work by the Indiana Statute Revision Commission, which rearranged then-existing Indiana statutes into titles, articles, chapters, and sections. It was "intended to have the status of past enacted revisions and thus provide a clear and unambiguous statement of Indiana statute law." Indiana Legislative Council, *Appendix: History of Official Indiana Statutes*, *in* THE HISTORY OF INDIANA LAW 374 (David J. Bodenhamer & Hon. Randall T. Shepard eds., 2006).

4

for "original enactments of codifications of laws" under the 1960 amendment to Section 19 and that an act included therein regarding both the subject of good time diminution of sentence length and the subject of salaries for prison officials and employees violated Section 19 because it contained two subjects that were not properly connected with each other.  Pearcy, 262 Ind. at 15–18, 274 N.E.2d at 522–23.

Shortly after our opinion in Pearcy, the Indiana General Assembly proposed an amendment of Section 19 to rephrase its codification exclusion to read "an act for the codification, revision or rearrangement of laws" and to excise the requirement that the subject of an act be expressed in its title but retained the original requirement that each legislative act must be confined to a single subject and properly connected matters.  This amendment was ratified by Indiana voters in 1974, producing Section 19 in the form that survives today.[3]  Thus the single-subject requirement stands expressly endorsed not only by the framers and ratifiers of Indiana's 1851 Constitution but also by the General Assembly and voters one hundred twenty-three years later.

The rules enacted by each chamber of the General Assembly also reflect the legislature's concern for compliance with the Single-Subject Clause.  Both chambers have adopted internal rules requiring that proposals to amend bills be germane to the subject matter under consideration.[4]

---

[3] After ratification of the 1974 amendment to Section 19, the General Assembly in 1976 again passed a codification of Indiana law, which closely resembled the Indiana Code of 1971 that had been struck down in Pearcy.  Indiana Legislative Council, *supra* note 2, at 375.

[4] The House Rules provide, "[n]o motion or proposition on a subject not germane to that under consideration shall be admitted under color of an amendment."  Rules of the House of Representatives (One Hundred Sixteenth General Assembly of Indiana), Rule 80.  The Senate Rules contain a similar provision:

> No motion to amend, committee action, concurrence or conference committee action which seeks under color of amendment to substitute or insert subject matter not germane to [] that of the bill or resolution under consideration shall be in order. However, this Rule does not apply to House bills raising revenue and relating to other taxation matters.
> Any conference committee report not in accordance with Article 4, Section 19 of the Constitution shall be not in order.

Standing Rules and Orders of the Senate, Rules 53–54.

5

The presence of prior cases in which this Court may have appeared reluctant to enforce Section 19's limitations on the exercise of power by the legislature does not foreclose reconsideration of the standard of review under the doctrine of *stare decisis*. When "deciding so grave a matter as that of the constitutionality of an act of the legislature," we have long recognized that the rule of *stare decisis* does not compel our adherence to "our own former decisions." Denney v. State ex rel. Basler, 144 Ind. 503, 539, 42 N.E. 929, 940 (1896). *Stare decisis* does not apply "with its usual force and vigor to decisions upon constitutional questions" or "to questions involving the interpretation and construction of the organic law, the structure of the government, and the limitation upon the legislative and executive power." Robinson v. Schenck, 102 Ind. 307, 319–20, 1 N.E. 698, 706 (1885) (internal citation omitted).

The series of prior cases reflecting the possible lack of vigorous enforcement of Section 19 does not preclude this Court from discharging our constitutional responsibilities to uphold and enforce the Indiana Constitution, especially in light of the reaffirmation of the single-subject requirement in 1974 by Indiana's General Assembly and Hoosier voters. Such reinvigoration of the Single-Subject Clause should revitalize this Court's willingness to seriously consider claims that legislation was enacted in violation of Section 19.

As co-equal and independent branches of government, both the legislature and the judiciary have complementary functions. Our Constitution "empowers the legislative branch to make law." Baldwin v. Reagan, 715 N.E.2d 332, 338 (Ind. 1999). The judiciary is responsible to "interpret and apply the law," but must exercise such "authority with restraint and respect for the role and function of the legislative branch to decide questions of public policy." Fraley v. Minger, 829 N.E.2d 476, 492 (Ind. 2005). It is altogether appropriate for the judiciary to defer to legislative public policy decisions but equally important for the judiciary to compel adherence to the requirements of our Constitution.[5] When addressing claimed violations of the Single-Subject

---

[5] The Single-Subject Clause of Section 19 is a structural provision of the Indiana Constitution. It limits the manner by which the General Assembly may exercise its power to pass laws. Its qualification, "properly connected therewith," calls for a comparison of textual provisions and a determination of the logical relatedness of the covered subjects. This analysis does not require a judicial evaluation of public

Clause, courts should examine the subject matter of a challenged statute and that of the enactment to which it was attached and then use a *de novo* evaluation to determine whether the former is properly connected to the single subject of the latter. The judicial inquiry is not whether the legislature's judgment and actions in combining two subjects appear "reasonable," but rather whether the subject matter of the principal and annexed enactments are properly connected to the same single subject. The 1974 revision of Section 19 echoes the text and the concerns of our 1851 framers and ratifiers. It defines the test to be applied: whether an act passed by the legislature is "confined to one subject and matters properly connected therewith." IND. CONST. art. 4, § 19.

In the present case, I concur with the Court's determination. Even with a robust application of the Single-Subject Clause of Section 19, there is no constitutional violation. The challenged statutes, directly related to the financial responsibility of DCS for the placement of certain juveniles, were enacted as part of the legislature's general appropriation bill and were clearly "matters properly connected therewith" under Section 19. This conclusion is apparent from the text of the challenged statutes when compared to the text of the remainder of the appropriation bill to which they were annexed. I join my colleagues in holding that the inclusion of language amending Indiana Code § 31-40-1-2(f) in the 2009 Indiana state appropriation bill does not violate the Single-Subject Clause, Article 4, Section 19 of the Indiana Constitution. And in all other respects, I concur.

---

policy, which is the proper province of the legislature. In contrast, the judicial branch has exercised considerable deference to legislative policy-making when addressing constitutional challenges asserting violation of provisions that are less structural and more intricately entwined with legislative policy determinations. *See, e.g.*, Collins v. Day, 644 N.E.2d 72, 80 (Ind. 1994) (addressing the Privileges and Immunities Clause, Article 1, Section 23 of the Indiana Constitution).

**Sullivan, Justice, concurring in part.**

**I**

I concur fully with the Court's jurisdictional analysis and with Part III of its opinion.

Part III fully resolves the claims in this case, making it unnecessary for the Court to address the constitutional claims in Parts I and II. More than a century ago, this Court said "courts will not pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause." State v. Darlington, 153 Ind. 1, 4, 53 N.E. 925, 926 (1899) (citations omitted).[1] Adhering to this doctrine, I express no opinion as to whether the statutes at issue in this case violate the Single Subject Clause or the Separation of Functions Article.

**II**

Part I of the Court's decision today concerning the Single Subject Clause of Art. IV, § 19, conforms with the deferential standard of reasonableness that this Court has accorded the General Assembly in a long line of cases dating back 145 years. Both history and sound jurisprudence warrant adherence to these precedents. I therefore respectfully disagree with Justice Dickson's suggestion that the courts of this state not adhere to precedent and instead begin what he terms "robust" enforcement of the Single Subject Clause.

"This Court has regarded the task of interpreting particular provisions of the Indiana Constitution as a search for the common understanding of both those who framed it and those who ratified it." Bayh v. Sonnenburg, 573 N.E.2d at 412 (citations omitted). The current form of Art. IV, § 19, was adopted by the voters of our State in 1974, after previously having been amended in 1960. Because it was the General Assembly and the voters in 1974 that framed and

---

[1] Accord Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004) (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346 (1936) (Brandeis, J., concurring)); Ind. Wholesale Wine & Liquor Co. v. State ex rel. Ind. Alcoholic Beverage Comm'n, 695 N.E.2d 99, 106-08 (Ind. 1998); Bayh v. Sonnenburg, 573 N.E.2d 398, 402 (Ind. 1991).

ratified the current version of Art. IV, § 19, we should be primarily concerned with their "common understanding," and not so much with the understanding of the people in 1851 on which Justice Dickson focuses his analysis.

The analysis benefits from setting forth the relevant texts. The current version of Art. IV, § 19, as ratified by the voters in 1974, provides:

> An act, except an act for the codification, revision or rearrangement of laws, shall be confined to one subject and matters properly connected therewith.

An earlier version of Art. IV, § 19, ratified by the voters in 1960, provided:

> Every act, amendatory act or amendment of a code shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, amendatory act or amendment of a code, which shall not be expressed in the title, such act, amendatory act or amendment of a code shall be void only as to so much thereof as shall not be expressed in the title. The requirements of this paragraph shall not apply to original enactments of codifications of laws.

> Every amendatory act and every amendment of a code shall identify the original act or code, as last amended, and the sections or subsections amended shall be set forth and published at full length. The identification required by this paragraph may be made by citation reference.

The original version of Art. IV, § 19, as adopted in 1851, provided:

> Every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.

So how did the General Assembly and the voters in 1974 understand the single-subject requirement? Unlike the recorded debates from the 1850 Constitutional Convention, there is no thorough source of legislative history surrounding the 1974 amendment. But that is not to say that there is no evidence concerning the understanding of the people in 1974. Beginning in 1865 and continuing to this day, this Court has applied a reasonableness test when assessing the constitutionality of statutes under Art. IV, § 19:

2

> [T]he only test which this court can apply is the indefinite one of "reasonableness," a standard and not a specific rule of law. [Art. IV, § 19] does not, by restricting the contents of an "act" to one subject, contemplate a metaphysical singleness of idea or thing, but rather that there must be some rational unity between the matters embraced in the act; the unity being found in the general purpose of the act and the practical problems of efficient administration. It is hardly necessary to suggest that matters which ordinarily would not be thought to have any common features or characteristics might for purposes of legislative treatment be grouped together and treated as one subject. For purposes of legislation, "subjects" are not absolute existences to be discovered by some sort of a priori reasoning, but are the result of classification for convenience of treatment and for greater effectiveness in attaining the general purpose of the particular legislative act. And if, from the standpoint of legislative treatment, there is any reasonable basis for the grouping together in one "act" of various matters, this court cannot say that such matters constitute more than one subject.

State ex rel. Test v. Steinwedel, 203 Ind. 457, 467-68, 180 N.E. 865, 868 (1932), quoted in Dague v. Piper Aircraft Corp., 275 Ind. 520, 531, 418 N.E.2d 207, 214 (1981). This Court has also held that "if there is any reasonable basis for grouping together in one act various matters of the same nature, and the public cannot be deceived reasonably thereby, the act is valid." Stith Petroleum Co. v. Ind. Dep't of Audit & Control, 211 Ind. 400, 409, 5 N.E.2d 517, 521 (1937) (citing Steinwedel, 203 Ind. 457, 180 N.E. 865; Baldwin v. State, 194 Ind. 303, 141 N.E. 343 (1923); Maule Coal Co. v. Partenheimer, 155 Ind. 100, 55 N.E. 751 (1899); and Bright v. McCullough, 27 Ind. 223 (1866)), quoted in Dague, 275 Ind. at 531-32, 418 N.E.2d at 214.

Under this reasonableness standard of review – the standard of review employed by the Court today – the General Assembly has been given substantial deference but not carte blanche. See, e.g., State ex rel. Pearcy v. Criminal Court of Marion Cnty., 262 Ind. 9, 17, 274 N.E.2d 519, 522 (1971) ("no rational unity existing between the provisions relating to" correctional facility employees and criminal sentencing); Jackson v. State ex rel. S. Bend Motor Bus Co., 194 Ind. 248, 257-58, 142 N.E. 423, 426 (1924) ("no apparent relation between the subject of motor vehicles and the subject of inheritance taxes").[2]

---

[2] The only case that Justice Dickson quotes in support of his position is Kuhns v. Krammis, 20 Ind. 490 (1863). It is true that the Court held in that decision that an act passed by the General Assembly was invalid under Art. IV, § 19. Id. at 491-92. But in Robinson v. Skipworth, decided the very next year, the Court overruled Kuhns, expressing "surprise at the ruling in [that] case." 23 Ind. 311, 316-18 (1864). It

3

Of relevance to our analysis is the amendment to Art. IV, § 19, ratified by the voters in 1960. The principal purpose of the 1960 amendment was to correct an "[u]nwieldy . . . process" under cumbersome bill-title requirements contained in Art. IV, § 21. Marcia J. Oddi, Enforcing Indiana's Constitutional Requirement That Laws Be Limited To One Subject, Res Gestae, March 2001, at 18, 21. The 1960 amendment repealed Art. IV, § 21; the new language comprising the second paragraph of Art. IV, § 19, reflected a simplification of former Art. IV, § 21. Id. This change is not particularly relevant for our inquiry today.

But the very fact that Art. IV, § 19, was amended in 1960 gave the amendment's "framers and ratifiers" (to use Sonnenburg's formulation, 573 N.E.2d at 412) a chance to express their common understandings of the Single Subject Clause. Had there been any reservation or objection that this Court had not properly enforced the Clause in Steinwedel, Stith Petroleum, and the rest, the language of the Clause could have been changed. But no change was made.

Next comes the critical case of State ex rel. Pearcy v. Criminal Court of Marion County, 262 Ind. 9, 274 N.E.2d 519 (1971). In the 1960 amendment, a new sentence had been added to the first paragraph of Art. IV, § 19, "open[ing] up the language of the one-subject requirement to permit an exception for 'original enactments of codifications of law.'" Oddi, supra, at 21. In Pearcy, this Court held that the Indiana Code of 1971 was not a "codification of law" within the meaning of the 1960 amendment and so the exception to the single subject requirement was not available. 262 Ind. at 15-16, 274 N.E.2d at 521-22.

As Justice Dickson notes, the 1974 amendment was precipitated by Pearcy.[3] If the 1960 amendment suggested framer and ratifier acquiescence to the Court's single-subject jurisprudence, the 1974 amendment demonstrates it. For in 1974, the General Assembly and the voters amended Art. IV, § 19, to repudiate a decision of this Court – Pearcy, concerning

---

held that "the court of last resort ought not to declare the section referred to unconstitutional, unless the question is free from every doubt" and noted that it "entertain[ed] no doubt" as to the constitutionality of the act at issue in Kuhns. Id. at 318.

[3] Indeed, after the 1974 amendment to Art. IV, § 19, was ratified, the General Assembly in 1976 again enacted a wholesale codification of Indiana statutory law. Oddi, supra, at 34 n.32.

recodifications – but made no changes whatsoever to repudiate our decisions concerning the Single Subject Clause.

Twice the framers and ratifiers of Art. IV, § 19, have changed its language without expressing any reservations or objections to our Court's decisions concerning the Single Subject Clause. This acquiescence by framers and ratifiers to our Court's decisions warrants the greatest respect on the part of Indiana courts. And I think this is an important point. For even if one were to agree as a general matter with Justice Dickson's view that "the rule of stare decisis does not compel our adherence" to our own precedents on constitutional questions, surely we should do so in the face of such clear and relatively recent acquiescence to those precedents by the framers and ratifiers of the current constitutional provision.

The reasonableness standard conforms to the theory of judicial review prevalent during the nineteenth century. In 1893, James B. Thayer examined the decisions of state and federal courts during the nineteenth century and the role of the judiciary in a democracy and concluded that courts did not, and should not, invalidate an act of the legislature unless that body had made a clear mistake – "so clear that it is not open to rational question." James B. Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv. L. Rev. 129, 144 (1893). Indeed, this Court applied a deferential standard such as this in the case Justice Dickson relies upon to assert the justiciability of Art. IV, § 19, claims. In Indiana Central Railroad Co. v. Potts, after holding that the Indiana Constitution imposes upon the Court the duty of determining whether an act complies with Art. IV, § 19, the Court proceeded to uphold the enactment at issue because "it [was] not so clearly misplaced as to render it void." 7 Ind. 681, 687 (1856).

Finally, the deferential standard of reasonableness applied by our Court since 1865 provides a familiar standard for courts to apply. It is applied in other areas of constitutional law, criminal law, and civil law, and it has been applied since the early days of the common law. We have held that courts should not attempt to investigate the motives and actions of individual legislators. E.g., Jackson, 194 Ind. at 253, 142 N.E. at 424. As Justice Dickson notes, the General Assembly on its own initiative has adopted internal procedures dealing with germaneness and public notice. These rules and procedures, combined with our review for

5

reasonableness, are in my view sufficient to prevent the gross abuses that appear to have prompted the original concerns underlying the Single Subject Clause.

The Court today adheres, as it should, to 145 years of precedent according substantial deference to the General Assembly in these matters.  No change is warranted.